Argued and submitted March 6, reassigned May 7, 1990, judgment of conviction affirmed, sentence of death vacated and remanded to the circuit court for further proceedings February 7, reconsideration denied March 19, 1991

# STATE OF OREGON,
*Respondent,*

*v.*

# MARK ALLEN PINNELL,
*Appellant.*

## (TC 85-1106, C88-0026CR; SC S35371)

806 P2d 110

J. Bradford Shiley, Portland, argued the cause for appellant. With him on the brief was Des Connall, A Professional Corporation, Portland.

Timothy A. Sylwester, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, Virginia L. Linder, Solicitor General, and Brenda J Peterson and Richard D. Wasserman, Assistant Attorneys General, Salem.

Before Peterson, Chief Justice, and Carson, Jones,*
Gillette, Van Hoomissen, Fadeley and Unis, Justices.

UNIS, J.

---

* Jones, J., resigned April 30, 1990.

## UNIS, J.

This case is before this court on automatic and direct appeal from an aggravated murder conviction and sentence of death. ORS 163.150(1)(f) (*amended by* Or Laws 1989, ch 790, § 135b). A jury found defendant, Mark Pinnell, guilty on six counts of aggravated murder and two counts of felony murder involving a single victim.[1] Following the findings by the jury during the penalty phase, the court entered a judgment sentencing defendant to death on the aggravated murder by torture conviction. Defendant seeks reversal of his conviction, asserting numerous assignments of error. For the reasons stated below, we affirm the judgment of conviction for aggravated murder, vacate the sentence of death, and remand this case to the circuit court for a new penalty phase proceeding.

### THE FACTS

Because the jury found defendant guilty, we state the facts in the light most favorable to the state. *State v. Douglas,* 310 Or 438, 440, 800 P2d 288 (1990); *State v. Brown,* 310 Or 347, 350, 800 P2d 259 (1990).

In August 1985, defendant contacted Randy Brown in response to an advertisement placed by Brown in "Swing N Sway" Magazine, a publication through which persons meet for sexual purposes. Defendant and Brown met and engaged in homosexual relations. On September 9, 1985, defendant again contacted Brown and arranged to meet with him later

---

[1] Defendant was charged with aggravated murder by torture, ORS 163.095(1)(e), felony murder during the course of a burglary, ORS 163.115(1)(b)(C), and felony murder during the course of a robbery, ORS 163.115(1)(b)(G). Defendant moved to dismiss the aggravated murder counts. The trial court sustained defendant's motion. The state appealed, and the Court of Appeals, one judge dissenting, affirmed. *State v. Cornell/Pinnell,* 83 Or App 559, 732 P2d 922 (1987). The state appealed to this court. We reversed and remanded with instructions to reinstate the indictments. *State v. Cornell/Pinnell,* 304 Or 27, 741 P2d 501 (1987). Upon remand, defendant was charged with five additional crimes. The charges were: (1) aggravated murder by personally and intentionally committing the homicide during the course of a burglary, ORS 163.095(2)(d); (2) aggravated murder by personally and intentionally committing the homicide during the course of a robbery, ORS 163.095(2)(d); (3) aggravated murder by homicide for the purpose of concealing the identity of the perpetrator of a burglary, ORS 163.095(2)(e); (4) aggravated murder by homicide for the purpose of concealing the identity of the perpetrator of a robbery, ORS 163.095(2)(e); and (5) aggravated murder by homicide for the purpose of concealing the identity of the perpetrator of a theft, ORS 163.095(2)(e).

that evening at Brown's residence. Defendant and his then constant companion, Donald Cornell, were driven by a friend to a location near Brown's house. The two men gained entry into the house and tied Brown's hands and feet together behind his back with electrical cord and other materials. Brown also was blindfolded and gagged. Defendant and Cornell repeatedly threatened Brown with a knife, and one of the men kicked Brown on the side of the head when Brown attempted to loosen the bindings. Over the ensuing three-hour period, defendant and Cornell ransacked the house, loaded the stolen property into Brown's pickup truck and left, leaving Brown tied and gagged on the bathroom floor. Brown eventually managed to summon help and suffered no permanent injuries.

Several days later, defendant obtained the use of a car from his ex-wife, Dixie Timmons. Shortly after midnight on September 19, 1985, defendant called John Ruffner, the victim in this case. Ruffner had an advertisement in the same issue of "Swing N Sway" in which Brown's advertisement appeared. Driving Timmons' car, with Cornell and an acquaintance named Velma Varzali as passengers, defendant went to the victim's apartment in Tualatin. Once there, defendant parked, left Cornell and Varzali in the car, and went to see the victim. About five minutes later, Cornell left the car. Several hours later, defendant and Cornell returned to the car, loaded it with property stolen from the victim's apartment, and drove back to their lodgings.

Ruffner's body was found the next day. His apartment had been ransacked. Ruffner's body lay on the bathroom floor, with hands and feet tied behind his back in part with electrical cords ripped from appliances in the apartment. He was gagged in part with a scarf, and a ligature was wrapped around his neck. Additionally, a large wad of tissue paper was stuffed into his mouth. The autopsy revealed that Ruffner died of asphyxiation as a result of either the tissue or the ligature. Ruffner's body also had cuts on his hands and a "blunt-force injury to the right side of his head."

On September 22, 1985, defendant and Cornell were arrested. Defendant eventually was indicted for six counts of aggravated murder and two counts of felony murder involving a single victim, Ruffner. Defendant was found guilty by

the jury of all eight counts. At sentencing, all counts were merged into count number 1, aggravated murder by torture.[2]

## 1. *VOIR DIRE ASSIGNMENT OF ERROR*

■        During *voir dire,* the state, over defendant's timely objections, questioned potential jurors individually regarding their willingness to consider in the penalty phase of the trial[3] whether defendant had a past criminal history in assessing the probability of defendant's future dangerousness, *i.e.,* the probability that he would commit acts of violence in the future. With the exception of the incident involving Randy Brown, evidence concerning defendant's prior criminal history was neither proffered by the state nor admitted in the guilt phase of defendant's trial. Additional evidence of defendant's prior criminal history was, however, relevant to the jury's assessment of defendant's future dangerousness and, therefore, was properly admitted in the penalty phase of the trial. *State v. Montez,* 309 Or 564, 610-12, 789 P2d 1352 (1990); *State v. Pratt,* 309 Or 205, 210, 785 P2d 350 (1990); *State v. Moen,* 309 Or 45, 70-76, 786 P2d 111 (1990); *State v. Wagner,* 305 Or 115, 178, 752 P2d 1136 (1988), *vacated and remanded* on other grounds, 492 US 914, 109 S Ct 3235, 106 L Ed 2d 583 (1989). The prosecutor asked 10 of the 12 jurors

---

[2] ORS 163.095(1)(e) provides:

"As used in ORS 163.105 and this section, 'aggravated murder' means murder as defined in ORS 163.115 which is committed under, or accompanied by, any of the following circumstances:

"* * * * *

"(e)      The homicide occurred in the course of or as a result of intentional maiming or torture of the victim."

ORS 163.115 provides in part:

"(1)  * * * [c]riminal homicide constitutes murder:

"(a)   When it is committed intentionally * * *."

[3] "Aggravated murder trials are divided into two phases, the guilt phase and the penalty phase." *State v. Pratt,* 309 Or 205, 210, 785 P2d 350 (1990). If a jury returns a guilty verdict on the charged offense, the trial proceeds to the penalty phase. In the penalty phase, the same jury hears evidence to determine whether the death penalty is to be imposed.

One question that the jury is required to answer in the penalty phase of a capital trial is this:

"Whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society."

ORS 163.150(1)(b)(B).

who ultimately sat in both the guilt and penalty phases of the trial questions similar in content to that asked of Juror Colburn:

> "Q. [Prosecutor:] One of the things in this case that you may be called upon to do is to determine whether this man, if he committed an aggravated murder, is likely to cause future violence. That kind of involves a future prediction. In doing that, *would you be willing to consider whether he has been convicted of crimes in the past?*" (Emphasis added.)
>
> "A. [Juror Colburn:] I think that is an important consideration."

Defendant contends that those questions impermissibly suggested evidence of his bad character to the jury before its determination of his guilt on the charged offenses and that, because his past criminal history was not admissible in the guilt phase of his trial, the jury improperly might have inferred that he was guilty of the present charges because he is a bad person. Defendant argues, therefore, that the trial court erred when it allowed the questioning over his objections. Although we agree that the court erred in permitting the questions, the error does not require reversal in the circumstances of this case.

Although the issue presented by the assignment of error arises on *voir dire,* some discussion of pertinent evidence rules is helpful to an understanding of that issue. Evidence of other crimes, sometimes referred to as uncharged misconduct evidence,[4] is one *form* of evidence generally known as "bad-character evidence." The general rule is that the prosecutor is prohibited from introducing evidence of other crimes or bad acts by the accused unless the evidence is introduced for some relevant purpose other than to suggest that, because the accused is a person of criminal character, he or she is more likely to have committed the charged crime. OEC 404(2) and (3); McCormick on Evidence 557-58, § 190 (3d ed 1984).[5] That general rule is often described as "the

---

[4] *State v. Johns,* 301 Or 535, 543-44, 725 P2d 312 (1986), citing Imwinkelried, Uncharged Misconduct Evidence 20, § 1.04 (1984).

The phrase "uncharged misconduct evidence" denotes crimes, wrongs, or acts that are not charged in the indictment for which the defendant is currently on trial.

[5] *See State v. Pratt, supra,* 309 Or at 210 ("[g]enerally, evidence of other crimes is inadmissible to show the character of a defendant or his *propensity* to commit crimes." (Emphasis added.))

propensity rule," Lempert & Saltzberg, A Modern Approach to Evidence: Text, Problems, Transcripts and Cases 215-16 (2d ed 1982), or the rule that generally prohibits the "use of character as circumstantial evidence, or as it is sometimes called, character to prove conduct." Wright & Graham, 22 Federal Practice and Procedure 342, § 5232.

OEC 404(2), which sets forth the propensity rule, provides in part:

> "Evidence of a person's character is not admissible for the purpose of proving that the person acted in conformity therewith on a particular occasion * * *."

The propensity rule also is restated in the first sentence of OEC 404(3) that precludes a prosecutor from introducing evidence of an accused's other crimes "to prove the [accused's bad] character * * * in order to show that the [accused] acted in conformity therewith."

Evidence *first* introduced by the prosecution that the accused has committed another crime or wrongful act that is offered as circumstantial evidence of conduct violates two rules: (1) the rule, OEC 404(2)(a),[6] that evidence of good character must be introduced by the accused before evidence of bad character can be used by the prosecution to prove conduct; and (2) the rule, OEC 405(1),[7] that character to prove conduct cannot be proved by specific instances of conduct.

Although other crimes evidence generally may not be used as circumstantial evidence to show how the accused acted on a particular occasion, such evidence may be admissible for various other purposes: first, situations in which character itself is "an essential element of a charge, claim or defense," OEC 404(1); second, the use of character evidence to impeach or *support* the credibility of a witness pursuant to

---

[6] OEC 404(2) provides in part:

> "Evidence of a person's character is not admissible for the purpose of proving that the person acted in conformity therewith on a particular occasion, except:

> "(a) Evidence of a pertinent trait of character offered by an accused, or by the prosecution to rebut the same[.]"

[7] OEC 405(1) provides:

> "In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On cross-examination, inquiry is allowable into relevant specific instances of conduct."

OEC 607,[8] OEC 608[9] and OEC 609[10] (a use of character evidence expressly recognized in OEC 404(2)(c)); and third, the use of "other crimes evidence" to prove relevant facts other than conduct, such as "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident" (noncharacter uses of such evidence), OEC 404(3).[11]

Bad character evidence (such as other crimes by the accused) is excluded under the propensity rule, not because it is irrelevant, but because of the risk of unfair prejudice[12] to

---

[8] OEC 607 provides:

"The credibility of a witness may be attacked by any party, including the party calling the witness."

[9] OEC 608 provides:

"(1) The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but:

"(a) The evidence may refer only to character for truthfulness or untruthfulness; and

"(b) Evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise.

"(2) Specific instances of the conduct of a witness, for the purpose of attacking or supporting the credibility of the witness, other than conviction of crime as provided in ORS 40.355, may not be proved by extrinsic evidence. Further, such specific instances of conduct may not, even if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness."

[10] OEC 609(1) provides:

"For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime * * * shall be admitted if elicited from the witness or established by public record, but only if the crime (a) was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted, or (b) involved false statement or dishonesty."

[11] OEC 404(3) does not create an exception to the rule against character evidence; it defines the noncharacter uses of such evidence. Stated differently, OEC 404(3) does not create exceptions to the rule excluding character evidence to prove guilt; rather, it provides an avenue for admitting evidence that proves guilt without any inference to character.

The "other crimes, wrongs or acts rule" stated in OEC 404(3) is simply a special application of the doctrine of multiple admissibility (see OEC 105), i.e., evidence inadmissible for one purpose is not to be excluded if it is admissible for another relevant purpose unless the judge in his/her discretion determines that the "unfair prejudice, confusion of issues, * * * misleading the jury, * * * undue delay," see OEC 403, from its use for the improper purpose substantially outweigh the legitimate probative value. See Wright and Graham, 22 Federal Practice and Procedure 435, § 5239.

[12] All evidence offered by either the prosecution or the defense is intended to prejudice the other side of the lawsuit. " 'Unfair prejudice,' in the context of OEC

the accused. The propensity rule's general prohibition of bad character evidence, codified in OEC 404(2) and OEC 404(3), is a specific application of OEC 403.[13] The theory is that the risk that the jury will convict for crimes other than those charged, or because the accused deserves punishment for his past misdeeds, outweighs the probative value of the inference that "he's done it before, he's done or will do it again." Weinstein & Berger, Weinstein's Evidence Manual 7-6, ¶ 7.01[01] (Student ed 1987). It is also feared that the jury will give more weight to the evidence than it deserves in assessing guilt of the crime charged. Louisell & Mueller, 2 Federal Evidence 128-29, § 136. One court graphically described the danger of unfair prejudice of "other crimes" evidence: "A drop of ink cannot be removed from a glass of milk." *Government of Virgin Islands v. Toto,* 529 F2d 278, 283 (1979).[14] Another reason for the propensity rule in criminal cases is that it is viewed as unfair to require an accused to be prepared not only to defend against the immediate charge, but also to defend or explain away unrelated acts from the past.[15] Louisell & Mueller, *supra,* at 130-31, § 136. Additionally, courts are concerned with confusion of issues and undue consumption of time through what may be, in effect, a trial within a trial to ascertain the relationship between the purported other crime and the defendant. Wright & Graham,

---

403, means an undue tendency to suggest [a] decision[] on an improper basis, commonly, although not always, an emotional one." *Legislative Commentary to OEC 403, reported in* Kirkpatrick, Oregon Evidence 125 (2d ed 1989). *See* Imwinkelried, *The Use of Evidence of an Accused's Uncharged Misconduct to Prove Mens Rea: The Doctrines Which Threaten to Engulf the Character Evidence Prohibition,* 51 Ohio State L J 575, 580-82 (1990) (policy rationales for the character evidence prohibition discussed).

[13] OEC 403 provides:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."

[14] Unrelated misconduct evidence has been described as "the most prejudicial evidence imaginable against an accused." *People v. Smallwood,* 42 Cal 3d 415, 228 Cal Rptr 913, 922, 722 P2d 197, 205 (1986). Justice Cardozo stated that uncharged misconduct evidence can be a "peril to the innocent." *People v. Zackowitz,* 254 NY 192, 172 NE 466, 468 (1930).

[15] "A concomitant of the presumption of innocence is that a defendant must be tried for what he did, not who he is." *United States v. Myers,* 550 F2d 1036, 1044 (5th Cir 1977), *cert den* 439 US 847, 99 S Ct 147, 58 L Ed 2d 149 (1978).

*supra,* at 437; Imwinkelried, Uncharged Misconduct Evidence 4, § 8.01.

The state argues: ORS 163.150 mandates a bifurcated trial in a capital murder case with a single jury panel. Penalty-phase issues must be addressed in the *voir dire* of prospective jurors before the commencement of the trial. One of the primary issues to be resolved by the jury in the penalty phase is the probability of defendant's future dangerousness. ORS 163.150(1)(b)(B). See *supra* note 3. The state argues, therefore, that it is necessary for both parties to question prospective jurors during *voir dire* fully concerning that issue. According to the state, questions during *voir dire* that seek to assess a potential juror's willingness to consider a defendant's past criminal history are pertinent and proper, provided that the state intends to offer evidence of criminal history in the penalty phase of the trial, as the state did in this case.

The state's argument misses the mark. Admittedly, the state's need to present evidence of defendant's past criminal history in the penalty phase of the trial is significant. Its right to introduce such evidence is, as previously stated, clearly established. But, with the exception of crimes involving Brown, the state did not, as it concedes, have a legitimate basis for introducing evidence of defendant's prior criminal history in the guilt phase of the trial.

To secure the integrity of a fair trial, Oregon has chosen to require a bifurcated trial when an accused is charged with aggravated murder. *See* ORS 163.150. First, evidence that is relevant and admissible to the determination of the charged offense is admitted, and the jury is asked to determine innocence or guilt based solely on that evidence. Second, if the jury returns a guilty verdict on the charged offense, then it hears relevant evidence regarding the penalty phase issues. The two-tier trial is a procedural safeguard to insulate the jury from unduly prejudicial evidence. One of the purposes of the two-tier trial is to require the prosecution to establish the guilt of the accused by lawful evidence without *improperly* informing the jury, directly or by innuendo, of the defendant's prior criminal record. One of the purposes of the bifurcated trial is, in other words, to prevent the jury's verdict on innocence or guilt from becoming tainted by evidence of defendant's bad character that is admissible only in the penalty phase.

The objective of a bifurcated trial was thwarted by the prosecutor's questions during *voir dire,* to 10 of the 12 jurors who ultimately decided the case, which implied that defendant had previously been convicted of other crimes. Asking a prospective juror a question containing inadmissible matter is an improper use of *voir dire.*[16]

OEC 103(3) expresses a policy of preventing inadmissible evidence from being described to the jury during the course of the trial. OEC 103(3) provides:

"In jury cases, proceedings shall be conducted, to the extent practicable, so as to prevent inadmissible evidence from being suggested to the jury by any means, such as making statements or offers of proof or asking questions in the hearing of the jury."

"The policy adopted in [OEC 103(3)] is of sufficient importance that it is also addressed in two other rules. *See* Rules 104(3) and 513(2)." Kirkpatrick, Oregon Evidence 25 (2d ed 1989). *See also* OEC 102 ("The Oregon Evidence Code shall be construed to secure fairness * * * to the end that the truth may be ascertained and proceedings justly determined").

In allowing the prosecutor's questions during *voir dire* over defendant's timely and appropriate objections, the trial court erred.

■ The state also argues, however, that any error that resulted from the *voir dire* questioning is harmless. In the

---

[16] The attempt to communicate impressions by innuendo through improper statements of counsel in offering evidence or by putting impermissible questions to a witness is a similar improper tactic which has often been condemned by the courts. *See generally* 6 Wigmore on Evidence, § 1808 (Chadbourn Rev. 1976).

Our holding today comports in large measure with the standards set forth by the American Bar Association (ABA). The ABA Standards for Criminal Justice, Standard 3-5.3.(c) (2d ed. 1980), provides:

"The opportunity to question jurors personally should be used solely to obtain information for the intelligent exercise of challenges. A prosecutor should not intentionally use the voir dire to present factual matter which the prosecutor knows will not be admissible at trial or to argue the prosecution's case to the jury."

This admonition by the Bar is not limited to prosecutors alone. *See* ABA Standards for Criminal Justice, Standard 4-7.2.(c) (2d ed 1980) (rule applicable to all lawyers).

The commentary to Standard 3-5.3 states:

"The use of the voir dire to inject inadmissible evidence into the case is a substantial abuse of the process. Treatment of legal points in the course of voir dire examination should be strictly confined to those inquiries bearing on possible bias in relation to the issues of the case."

circumstances of this case, we agree. First, the evidence of defendant's guilt was overwhelming. Second, as we hold below, the trial court properly admitted evidence, during the guilt phase, of defendant's crimes involving Randy Brown. Because the jury heard substantial evidence of defendant's other crimes in the guilt phase, any prejudice that may have resulted from the impermissible *voir dire* questions was minor. We find, therefore, that there was little, if any, likelihood that the error affected the jury's verdict. *See State v. Isom,* 306 Or 587, 595-96, 761 P2d 524 (1988) (explaining standard).

## 2. *GUILT PHASE ASSIGNMENTS OF ERROR*

■ Defendant next contends that the trial court, over his objection, erred in admitting evidence during the guilt phase of the trial concerning his previous robbery of Randy Brown. Specifically, defendant argues that the introduction into evidence of the Brown robbery was highly prejudicial, inadmissible propensity evidence.

After hearing evidence at a pretrial omnibus hearing, the trial court ruled that evidence of the Brown crime was relevant and admissible to identify defendant as the perpetrator of the charged (Ruffner) crime.[17] Our task is to determine whether the record supports the trial court ruling.

Evidence of "other crimes, wrongs or acts" that tend to establish a criminal propensity, but which is independently relevant on a noncharacter theory such as identity, may be admissible for that limited purpose, OEC 404(3), under the doctrine of limited admissibility. *See supra* note 11.

Before evidence of other crimes offered to prove identity based on *modus operandi* is admissible, "[m]uch more is demanded than the mere repeated commission of crimes of the same class, such as repeated murders, robberies or rapes." McCormick, *supra,* at 559-60. The prosecution must establish by a preponderance of the evidence that (1)

---

[17] The trial court also ruled that evidence of the Brown crime was admissible on the issue of defendant's intent to kill Ruffner. Defendant did not challenge that ruling in either his brief or oral argument to this court. We, therefore, will not address that ruling.

Whether the evidence of the Brown crimes is relevant for a purpose other than propensity, *i.e.,* relevant to prove the identity of the perpetrator of the Ruffner crime, is a question of logical relevancy which the trial judge must decide under OEC 104(1).

there is a very high degree of similarity between the charged and uncharged crimes; and (2) the methodology is attributable to only one criminal, that is, the methodology is distinctive so as to earmark the acts as the handiwork of the accused. Imwinkelried, *supra,* at 21, § 3.10. *See State v. Johns,* 301 Or 535, 551, 725 P2d 312 (1986) (evidence of other crimes to prove identity "is strictly limited to crimes committed 'by the use of a novel means or in a particular manner' so as to earmark the acts as the handiwork of the accused. In other words, to prove identity the prior acts must be a 'signature' crime"); *State v. Pratt, supra,* 309 Or at 210 n 4 ("[t]o be admissible on the issue of identity [the uncharged] crimes must be nearly identical" or "sufficiently similar to constitute a 'signature crime' ").[18] Whether the two requirements, similarity and distinctiveness or unusual characteristics have been established is a preliminary fact question for the trial court under OEC 104(1).[19]

In deciding whether the first requirement has been met, *i.e.,* whether there is a very high degree of similarity between the charged and uncharged crimes, three factors are relevant: (1) the time lapse between the two crimes; (2) the geographic distance between the two crimes; and (3) the resemblances between the methodologies of the two crimes. Imwinkelried, *supra,* at 23-24, § 3.11. The three factors are just that — merely factors in the trial court's discretionary determination of the degree of similarity. *Id.* at 24. "[S]imilarities cannot be considered in a vacuum. The circumstances of each crime as a whole must be compared. * * * [D]issimilarities [also] must be as fully considered as the similarities * * *." *State v. Pratt, supra,* 309 Or at 214. Determining what constitutes a very high degree of similarity is a matter to be decided on a case-by-case basis. *Id.*

"[T]he third factor, the resemblances in methodology, is the most important consideration. * * * If both crimes are committed in the same, unique fashion, [that] factor alone is sufficient

---

[18] A classic example to illustrate the concept of *modus operandi* having a signature quality is the "mark of Zorro."

[19] OEC 104(1) provides:

"Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege or the admissibility of evidence shall be determined by the court, subject to the provisions of subsection (2) of this section. In making its determination the court is not bound by the rules of evidence except those with respect to privileges."

to support a permissible inference of the identity of the two criminals. The ultimate test is one of logic: Are the similarities in time, place, and methodology sufficient to sustain a rational inference of the identity of the two criminals?"

*Imwinkelried, supra,* at 24.

Proof of a very high degree of similarity between the two crimes is insufficient by itself to justify admitting the uncharged crime to prove the accused's identity, however. As Professor Imwinkelried states: "Even if the crimes are identical, it just may happen that every safe robber or counterfeiter is familiar with that technique." *Id.* at 26, § 3.12. Before evidence of other crimes is admissible to prove identity, the prosecutor must establish the second requirement, *i.e.,* that the methodology is so distinctive that both crimes can be attributed to "one" criminal. Here again, the prosecutor may attempt to establish the distinctiveness or unusual characteristics of the modus by listing all the points of similarity between the two crimes. As a general proposition, the greater the number of similarities, the stronger are the inferences of identity and distinctiveness. Even a long list of similarities does not necessarily establish an inference of distinctiveness. *Id.* In the final analysis, the issue is the rationality of the inference of distinctiveness rather than the sheer number of similarities. *Id.*

In applying these standards, we conclude that there is sufficient evidence in the record to support the trial court's finding that evidence of the uncharged (Brown) crime is relevant to *identify* defendant as the perpetrator of the charged (Ruffner) crime. Numerous points of similarities exist between the two crimes. Those similarities, when taken together and considered with the few dissimilarities, establish both a very high degree of similarity between the two crimes and the distinctiveness or unusual characteristics of the modus so "as to earmark" the two crimes "as the handiwork of the defendant."

The two victims lived only a few miles from each other and near where defendant was residing. Both victims were males who had placed advertisements in "Swing N Sway" magazine soliciting homosexual encounters. The victims' advertisements were on the facing pages of the same issue of the magazine. Each victim provided his telephone number in his advertisement. Each victim was contacted by

telephone on the day of the crime in response to their separate advertisements. The same telephone charge card was used to call both victims. In each instance, the caller made an appointment with the victim to meet him late in the night, and both the Brown robbery and the Ruffner crime were committed in the late night through early morning hours. Both Brown and Ruffner were tied securely with their hands and feet behind their backs and gagged. In each crime, the victim was tied with electrical cords ripped off lamps and appliances in the residence and with other materials taken from the victim's home. Each victim was struck hard in the face while tied and physically helpless. In each crime, the victim was left tied up in the bathroom after the robbery. The perpetrators spent several hours in each victim's house. In each crime, the victim's home was ransacked. In each crime, large amounts of personal property was taken from the victim's residence. The crimes occurred only nine days apart. During the Brown robbery, the victim was repeatedly threatened with death; Ruffner died during the robbery. There was evidence that both crimes were committed by defendant with the same accomplice, Donald Cornell.

The only dissimilarities are: Brown's assailants did not stuff paper in Brown's mouth or place a ligature around Brown's throat; Brown was blindfolded and Ruffner was not; and Brown did not die.

■     Our conclusion that there is evidence in the record sufficient to support the trial court's finding that evidence of Brown's crime is logically relevant to prove identity does not end our inquiry. Under OEC 403, relevant evidence is admissible so long as its probative value is not "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."

OEC 403, like its federal counterpart, FRE 403,

"requires the trial judge to go through a conscious process of balancing the costs of the evidence against its benefits. Unless the judge concludes that the probative worth of the evidence is 'substantially outweighed' by one or more of the countervailing factors, there is no discretion to exclude; the evidence must be admitted. If, on the other hand, the balance goes against probative worth, the judge is not required to exclude the evidence but he 'may' [in the words of OEC 403]

do so. In other words, the process of balancing is a prerequisite to the exercise of discretion but it is not a formula for its exercise; the rule presupposes a two-step process - balancing, then the discretionary judgment. Obviously the factors in the balancing test are to be taken into account in the exercise of discretion but they do not purport to control it. Discretion is an intuitive process not susceptible to the quantification presupposed by the metaphor of the scales."

Wright & Graham, *supra,* at 263-64.

In making his decision under OEC 403, the trial judge carefully engaged in the steps this court outlined in *State v. Mayfield,* 302 Or 631, 645, 733 P2d 438 (1987), and *State v. Johns, supra,* 301 Or at 557-59. He assessed the state's need for the evidence. He considered the strength of the state's evidence establishing the Brown crime and defendant's involvement in it. He analyzed the quantum of probative value of the evidence, that is, the extent to which the evidence of the Brown crime helps prove defendant as the perpetrator of the Ruffner murder. He considered the risk of unfair prejudice to defendant, that is, the extent to which the evidence would invite the jury to convict defendant on the improper basis that he is a bad person. He considered the time required to present the evidence and whether it would distract the jury. He articulated on the record his balancing analysis and the reasons for admitting the evidence.

There is sufficient evidence in the record to support the trial court's conclusions. The trial court did not err in permitting the state to introduce evidence of the Brown crime to identify defendant as the person who committed the Ruffner murder.

■    Defendant next contends that the trial court improperly permitted the state to introduce into evidence the transcripts of Lee Edger's and Anthony W. Stinsman's testimony given during a security release hearing that was conducted approximately four months prior to trial. At the security release hearing, Edger testified that he saw defendant and Cornell at a tavern on September 22, 1985, and that defendant attempted to sell him a television set for $75. At the time of trial, Edger was residing in Missouri. The whereabouts of Stinsman, whose testimony recounted a meeting with defendant the morning after the Ruffner murder and the request

that Stinsman cash checks on Ruffner's account,[20] was unknown.

The trial court, citing OEC 804(1)(d),[21] ruled that Edger was "unavailable" to testify at the trial "due to existing physical and medical infirmities"[22] and that both the transcripts of Edger's and Stinsman's security release hearing testimony qualified for admission as former testimony under OEC 804(3)(a).[23] Defendant challenges both of those rulings.[24]

The former testimony exception to the hearsay rule set forth in OEC 804(3)(a) may be invoked only when the declarant, the "person who makes a statement" out of court, OEC 801(2), is "unavailable as a witness" within the meaning of OEC 804(1). Whether the requirement of unavailability has been satisfied is a preliminary fact question for the trial court to decide under OEC 104(1). *State v. Douglas, supra,* 310 Or at 443. The proponent of the evidence has the burden of establishing the "unavailability of the witness" by a preponderance of the evidence. OEC 104(1) provides that "[i]n making its

---

[20] At the security release hearing, Stinsman testified that he could not remember whether defendant or Cornell made such a request.

[21] OEC 804(1)(d) provides:

"(1) 'Unavailability as a witness' includes situations in which the declarant:

"* * * * *

"(d) Is unable to be present or to testify at the hearing because of death or then existing physical or mental illness or infirmity; * * *."

[22] The trial court also ruled that Stinsman was "unavailable" as a witness under OEC 804(1)(e) because "[t]he state is simply unable to procure his [Stinsman's] attendance [at the trial] by process or other reasonable means and has certainly made more than a good-faith effort to do so." Defendant does not challenge that ruling.

[23] OEC 804(3)(a) provides:

"(3) The following are not excluded by [OEC 802, the hearsay rule,] if the declarant is unavailable as a witness:

"(a) Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or in a civil action or proceeding a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination."

[24] Defendant's contention that Edger was not shown to be unavailable as a witness is only a statutory claim. Defendant makes no claim that the admission of the hearsay statements of Edger and Stinsman violated his confrontation rights under Article I, section 11, of the Oregon Constitution and the Sixth Amendment to the federal constitution.

determination the [trial] court is not bound by the rules of evidence except those with respect to privileges." The trial court evaluates the evidence submitted in support or opposition to such a claim and acts as a trier of fact. *Id.* When it is contended, as in this case, that the witness is "unavailable" because of "then existing physical or mental illness or infirmity," the trial court may consider, for example, testimony, affidavits from physicians, medical records, or the informed word of counsel. This court is bound by the trial court's findings of historical fact that are supported by the record, but not by its legal conclusions. *Id.* We consider defendant's arguments with those principles in mind.

In this case, the only evidence presented to the trial court on the issue of Edger's "unavailability as a witness" was that presented by the state. Detective Schultze testified in a hearing out of the presence of the jury that, following the security release hearing, Edger traveled to Missouri and was hospitalized temporarily there for "alcoholism and some related mental problems." At the time Schultze learned of Edger's whereabouts, Edger had been released from the hospital and was living with his mother in Missouri. Schultze did not speak with Edger but spoke with Edger's mother on one occasion. She told Schultze that Edger's "memory was bad" and that he had "no long-term memory to speak of and *that his physical and mental health would not allow him to travel.*" (Emphasis added.) Edger's medical records obtained from the hospital in Missouri stated that Edger suffered from a "moderate impairment of his gross memory abilities and is unable to store new information in long term memory."

Based on that evidence, the trial court, without making any findings of historical fact, ruled that Edger was "unavailable to testify due to existing physical and medical infirmities under [OEC] 804(1)(d)." While we would have preferred specific findings on the question, we conclude that there was sufficient evidence before the trial court to support that ruling.

■　　The next question that we need to address is whether the trial court properly admitted the transcripts of Edger's and Stinsman's security release hearing testimony under OEC 804(3)(a). OEC 804(3)(a) qualifies, as an exception to the hearsay rule, former "[t]estimony given as a witness at

another hearing of the same or a different proceeding * * * if the party against whom the testimony is now offered * * * had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination."

When a defendant is charged with murder, his right to release on security pending trial will be denied if the state establishes at a security release hearing by "clear and convincing evidence" that the likelihood of the defendant's guilt is strong. *Haynes v. Burks,* 290 Or 75, 78-79, 619 P2d 632 (1980) (construing Article I, section 14, of the Oregon Constitution and ORS 135.240(2)).[25]

In this case, the security release hearing was extensive. It consumed four days of testimony. Defendant was present and was represented by counsel. The parties in the security release hearing and trial were identical. The issues at the security release hearing and trial were substantially identical.[26] Two of the persons who appeared and testified for the state during the security release hearing were Edger and Stinsman. Defendant had an opportunity[27] to cross-examine both Edger and Stinsman and did so quite extensively and vigorously. Defendant's motive[28] to develop the testimony of Edger and Stinsman at the security release hearing was similar to his motive at trial. The

---

[25] Article I, section 14, of the Oregon Constitution provides:

"Offences (sic), except murder, and treason, shall be bailable by sufficient sureties. Murder or treason, shall not be bailable, when the proof is evident, or the presumption strong."

ORS 135.240(2) and (3) provide:

"(2) When the defendant is charged with murder or treason, release shall be denied when the proof is evident or the presumption strong that the person is guilty.

"(3) The magistrate may conduct such hearing as the magistrate considers necessary to determine whether, under subsection (2) of this section, the proof is evident or the presumption strong that the person is guilty."

[26] At the security release hearing, the state had the burden of proving the likelihood of the defendant's guilt of murder by clear and convincing evidence, whereas at trial, proof of guilt must be shown beyond a reasonable doubt.

[27] "Opportunity," in the context of OEC 804(3)(a), refers to the legal or practical hurdles that would impede the examiner if the examiner were motivated to develop it, *e.g.,* witness asserted a privilege to prevent cross-examination or impeaching documents were not available. Graham, Kenneth W., Jr., *Former Testimony* 117, 122, Oregon Law Institute, 1982 Evidence Hearsay.

[28] "Motive," in the context of OEC 804(3)(a), refers to those tactical and strategic considerations that might reasonably influence the direction and extent of counsel's development of the testimony.

trial court properly permitted the state to introduce into evidence the transcripts of Edger's and Stinsman's security release hearing testimony. *See State v. Douglas, supra,* 310 Or at 442-45 (testimony given in a security release hearing met the requirements of OEC 804(3)(a), because the security release hearing provided the accused with an opportunity to cross-examine witnesses and suggested a motive to do so that was similar to the motive at trial).[29]

## 3. *PENALTY PHASE ASSIGNMENTS OF ERROR*

■        Defendant next argues that his penalty phase hearing was flawed because the trial court failed to instruct the jury concerning what has come to be called the "fourth question" in a death penalty case. That question permits the jury to spare defendant's life if the jury believes, under all the circumstances, that it is appropriate to do so, *see State v. Wagner,* 309 Or 5, 14-20, 786 P2d 93, *cert den* ___ US ___, 111 S Ct 212, 112 L Ed 2d 171 (1990) (*Wagner II*) (setting out reasons that a "fourth question," in addition to the three specifically provided in then-existing ORS 163.150,[30] must be given). Defendant's argument

----

[29] In this case, defendant did not object to the admission of transcripts of Edger's and Stinsman's security release hearing testimony on multiple hearsay grounds. When former testimony is sought to be proven by an official transcript made at the prior proceeding, as in the instant case, a problem of multiple hearsay is presented. "[OEC] 805 provides that multiple hearsay is admissible provided that each level of hearsay satisfies an exception to the hearsay rule." Kirkpatrick, *supra,* at 652. The transcript is being offered to prove what the reporter heard the witness state. That is the first level of hearsay because it involves the perception, recollection, narration and sincerity of the court reporter. If the witness' words are also being offered for their truth, a second level of hearsay exists because this brings into play the perception, recollection, narration and sincerity of the witness. The proponent may resolve the first level of hearsay, the proof that the words were uttered by the witness, through the past recollection recorded exception, OEC 803(5) (assuming the court reporter is available to qualify it), the business records exception, OEC 803(6), or the public records and reports exception, OEC 803(8). The second level of hearsay, the contents of the transcript being offered for the truth of what was asserted by the witness, is resolved by the former testimony exception, OEC 804(3)(a). For a discussion of multiple hearsay, *see* McCormick on Evidence 911-12, § 324.3 (3d ed 1984).

[30] At all times pertinent to defendant's trial, ORS 163.150(1) (which was amended by Oregon Laws 1989, chapter 720, section 2, in particulars not pertinent to our consideration of this case) provided in part:

"(b)  Upon the conclusion of the presentation of the evidence, the court shall submit the following issues to the jury:

"(A)  Whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that death of the deceased or another would result;

"(B)  Whether there is a probability that the defendant would commit

is well taken. This case was tried before our decision in *Wagner II*. The "fourth question" was not submitted to the jury. The penalty hearing was, therefore, constitutionally flawed.

We have considered all of defendant's remaining assignments of error and every argument made in support thereof. Any assignment or argument not discussed in this opinion either previously has been discussed by this court and resolved against defendant or is not well taken. We find no error based on those assignments of error.

The judgment of conviction for aggravated murder is affirmed, the sentence of death is vacated, and the case is remanded to the circuit court for further proceedings.

---

criminal acts of violence that would constitute a continuing threat to society. In determining this issue, the court shall instruct the jury to consider any mitigating circumstances offered in evidence, including, but not limited to, the defendant's age, the extent and severity of the defendant's prior criminal conduct and the extent of the mental and emotional pressure under which the defendant was acting at the time the offense was committed; and

"(C) If raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased."

In fact, only questions (A) and (B) were submitted to the jury in this case. There is no claim that any evidence required that question (C) also be submitted to the jury.