Argued and submitted January 23, 1991, judgments of conviction for aggravated
murder reversed, case remanded to circuit court for new trial October 29, 1992

# STATE OF OREGON,
*Respondent,*

*v.*

# ROBERT PAUL LANGLEY, JR.,
*Appellant.*

(CC 88C21623; SC S36298)

840 P2d 691

Stephen J. Williams, Deputy Public Defender, Salem, argued the cause for appellant. With him on the brief were Sally L. Avera, Acting Public Defender, and John P. Daugirda, Deputy Public Defender, Salem.

Janet A. Metcalf, Assistant Attorney General, Salem, argued the cause for respondent. With her on the brief were Dave Frohnmayer, Attorney General, Virginia L. Linder, Solicitor General, and Cynthia A. Forbes and Brenda J Peterson, Assistant Attorneys General, Salem.

FADELEY, J.

**FADELEY, J.**

This is an automatic and direct appeal from defendant's convictions and sentence of death on 14 counts of aggravated murder in the death of Larry Rockenbrant. The trial court erred when it admitted evidence of the murder of another person for the purpose of using some similarities between the two homicides to identify defendant as the killer of Larry Rockenbrant. Admission of that evidence was not harmless error. Accordingly, we reverse defendant's convictions for aggravated murder and remand this case to the circuit court for a new trial.

This opinion addresses only the evidentiary issue requiring reversal and defendant's claim of error relating to the penal statutes on which the indictment was based, *i.e.*, issues that *will* arise on a new trial.

From this court's recent examinations of the issue of "other crimes" evidence in *State v. Johnson*, 313 Or 189, 832 P2d 443 (1992); *State v. Pinnell*, 311 Or 98, 806 P2d 110 (1991); *State v. Pratt*, 309 Or 205, 785 P2d 350 (1990); and *State v. Johns*, 301 Or 535, 725 P2d 312 (1986), a clear methodological approach has emerged. Evidence of other crimes is not admissible as circumstantial evidence of a defendant's criminal character. OEC 404(3).[1] But it may be admitted if it is introduced for some other relevant purpose, such as to prove a defendant's identity by *modus operandi* as the perpetrator of the crime for which he or she is on trial. OEC 404(3). The sole purpose for which the trial judge admitted evidence in this case relating to the Gray homicide was to establish identity of defendant as Rockenbrant's killer. The jury instructions permitted the jury to consider the evidence for that purpose only. As *State v. Johnson, supra*, puts it, what is required is "a very high degree of similarity between the prior and charged misconduct or a methodology that is so distinctive so as to earmark the crimes as the handiwork of one criminal." 313 Or at 200. A three-part test

---

[1] OEC 404(3) provides:

"Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

governs the admissibility of "other crimes" evidence under OEC 404(3):

"(1) The evidence must be independently relevant for a noncharacter purpose [such as, in this case, for establishing identity by *modus operandi*]; (2) the proponent of the evidence must offer sufficient proof that the uncharged misconduct was committed and that defendant committed it; and (3) the probative value of the uncharged misconduct evidence must not be substantially outweighed by the dangers or considerations set forth in OEC 403. Each of these requirements must be satisfied before uncharged misconduct evidence is admissible under OEC 404(3)." *State v. Johnson, supra,* 313 Or at 195 (footnote omitted).

It is the first part of that three-part test that concerns us here.

■     To establish identity by *"modus operandi,"* the prosecutor must establish by a preponderance of the evidence that there is:

"(1) [A] *very high degree of similarity* between the prior and charged misconduct, and (2) a *distinctive nature of the methodology* of prior and charged misdeeds * * *." *State v. Johnson, supra,* 313 Or at 197 (emphasis in original).

This court has spelled out a test for determining whether similarity requirement has been met.

"In deciding * * * whether there is a very high degree of similarity between the charged and uncharged crimes, three factors are relevant: (1) the time lapse between the two crimes; (2) the geographic distance between the two crimes; and (3) the resemblances between the methodologies of the two crimes. Imwinkelreid, [Uncharged Misconduct Evidence (1984)] at 23-24, § 3.11. The three factors are just that — merely factors in the trial court's * * * determination of the degree of similarity. *Id.* at 24. '[S]imilarities cannot be considered in a vacuum. The circumstances of each crime as a whole must be compared. * * * [D]issimilarities [also] must be as fully considered as the similarities * * *.' *State v. Pratt, supra,* 309 Or at 214. Determining what constitutes a very high degree of similarity is a matter to be decided on a case-by-case basis. *Id.*" *State v. Pinnell, supra,* 311 Or at 110.

The resemblances between the methodologies of the two crimes is the most important factor. *Ibid.*

■■ The record in this case does not support a conclusion that the Gray and Rockenbrant murders are sufficiently similar and distinctive to warrant admission of evidence of the Gray murder to establish identity of the murderer of Rockenbrant based on *modus operandi*.[2] Our decision is based on the facts of this case, but also is informed by the direction taken from recent decisions of this court that a *very high degree of similarity* is required to justify the admission of other crimes evidence to establish identity based on *modus operandi. Compare State v. Johnson, supra* (reversing conviction) *and State v. Pratt, supra* (same) *with State v. Pinnell, supra* (affirming conviction based on a very high degree of similarity and a very distinctive methodology).[3]

The facts necessary to decide this appeal are, for its purposes, not disputed. Rockenbrant was acquainted with defendant through drug deals. Defendant asked his girlfriend, Sacha Thayer, to get him sedatives to "knock out" Rockenbrant so that he could "take it all" in one last deal. That did not work out. Later, defendant said that he was still going to go through with it, taking Thayer's baseball bat with him as he went to meet Rockenbrant again. He met Rockenbrant in the early evening on April 13, 1988, and arranged a drug deal for 1:30 a.m. on the 14th. Rockenbrant received a telephone call between 1:00 and 1:30 a.m. on April 14 and left in his Pontiac Firebird, saying he was going to meet defendant and others. Rockenbrant was never seen alive again.

At 3:30 a.m., Thayer heard defendant return the Toyota that they shared and drop off the keys, and she saw him leaving. Defendant returned to the state hospital where he was living (at the time of Rockenbrant's murder, he was an inmate in the state hospital's Mentally and Emotionally Disturbed Program) at 4:15 a.m., showed a counselor the keys to a 1982 Firebird, and explained that a friend, who had to return to jail, had given him the car provided that he make

---

[2] Whether the two requirements, similarity and distinctiveness, have been established is a preliminary question of fact for the trial court under OEC 104(1). *State v. Pinnell*, 311 Or 98, 110, 806 P2d 110 (1991).

[3] Treatises refer to "strikingly similar" and "unique behavorial pattern," Imwinkelreid, Uncharged Misconduct Evidence § 3:12, at 26 (1984); " 'signature' identifying a unique defendant," 2 Weinstein and Berger, Weinstein's Evidence § 404(16)(3), at 404-100 (1975).

the payments. When Rockenbrant's family called at about 7:00 that morning to inquire about his whereabouts, defendant told them that Rockenbrant was headed for Portland.

Earlier, on the afternoon of April 12, defendant had begun to dig what was supposed to be a "cactus" garden near a hedge in back of his hospital cottage. The hole was six feet, eight inches long; three feet, eight inches wide; and three feet deep. It was covered by a plywood board. By 8:30 on the morning of the 14th the hole had been filled in and a note on it stated "Cottage 18 garden plot. Please leave alone. Thank you." State hospital employees were investigating the "garden plot" that morning, when defendant appeared. Defendant fled in the Pontiac after he was asked to stay.

Rockenbrant's body was then unearthed from the "garden plot." He had been bludgeoned to death by at least ten blows to the head from a blunt instrument which could have been a baseball bat. His body was clothed; his ankles and wrists were bound by ligatures made from torn cloth; and his head was covered with clothes, a backpack, and a cloth. There was a bloody trail leading from the cottage garage to the grave site, and blood and hair consistent with Rockenbrant's were found in the trunk of the Toyota. On April 14, defendant sold some items to a second-hand store in Newport, including a radar detector that matched one removed from the Firebird and a ring similar to one that Rockenbrant had worn but was not found on his body.

The murder of Anne Gray occurred four months earlier, in December 1987. Gray was a neighbor of Thayer. Defendant concocted an elaborate story, both before and after Gray's murder, to assert that Gray had decided to leave her life in Salem behind, that she had contracted with defendant to sell her belongings, and that she had left for Portland (leaving a note on her door to that effect). Defendant had Thayer come to Gray's apartment at 7:30 on the morning of December 10, 1987, to "witness" the contract that he had drawn with Gray to sell the goods that Gray was supposedly leaving behind. When Thayer arrived, Gray was not in the front room. However, Thayer heard water running in the bathroom, assumed the noise was being made by Gray, signed the contract, and left. No one saw Gray alive thereafter.

Later that evening, defendant carried a heavy bundle wrapped in blankets from Gray's apartment to Thayer's station wagon. He placed the load in the back and told Thayer to drive to the house where his aunt and cousin lived. There, he unloaded the bundle, told Thayer to leave and return in 20 minutes, and carried the bundle around the side of the house. When Thayer returned, defendant, who was muddy and wet, said that he had fallen. Defendant put the muddy blankets in the car. Defendant thereafter set about trying to sell Gray's property, including her car. He tried selling her furniture to a buyer and sold other items to acquaintances.

When defendant's cousin heard of the Rockenbrant murder in April of 1988, she contacted police about a hole that defendant had dug in her backyard, near a hedge. Defendant had come into his aunt's home at 11:15 p.m. on a night in early winter of 1987 and told his cousin that he had dug a hole for a television antenna. He had placed a board over the hole.

Police unearthed Gray's body from the hole in defendant's aunt's backyard. Gray had died by asphyxiation or ligature strangulation. Her body was found in a grave five feet, five inches long; two feet, six inches wide; and two feet, three inches deep. Her body was clothed, tied by ligatures of duct tape and Gray's own climbing rope, bound in the fetal position, white tape covered her mouth, and her head was wrapped with duct tape.

The state relies primarily on the allegedly distinctive manner of handling and burying the victims and the use of false stories to explain the victims' disappearances and to get their property, to establish both the requisite very high degree of similarity between the crimes and the distinctiveness of the methodology. The state acknowledges that the victims died in completely different manners.

The methods of death for Rockenbrant and the other victim are totally different. Rockenbrant was bludgeoned. The other victim died from being deprived of air to breath. Neither method was particularly distinctive. Each victim was bound, but by different materials and in very different positions. Burial in a comparatively shallow grave is not a particularly distinctive method of disposing of a homicide victim, and the general similarity of the two different sites involved

in the state's proof here (in a yard near a hedge) is not highly distinctive. A "signature crime" is not established by this level of similarity.

Other aspects of the two homicides, as related to defendant, contain general similarities as the state contends, but they are interwoven with a number of dissimilarities. Defendant took elaborate precautions to create a story for Gray's disappearance both before and after her death. He did not do so for Rockenbrant. He told Thayer that his plan for Rockenbrant was "going to come down tonight," took a bat with him, made no particular secret of the deadly 1:30 a.m. meeting, and used Rockenbrant's car publicly as his own, while contradictorily telling Rockenbrant's mother that Rockenbrant was off to Portland. Although the fact that defendant took and sold some of his victims' property is a similarity, the methods of acquiring and selling the property differed completely.

The differences between these two murders are numerous and quite significant, while the similarities are few and not of a kind to distinguish these cases from some other homicides. Accordingly, the methodologies are not distinctive. The evidence of the Gray murder was not admissible in this case to establish the identity of defendant as Rockenbrant's murderer.

■ We consider briefly the state's contention that, if there was error in admitting evidence of the Gray homicide, then it was harmless error. The state acknowledges that it "presented all or virtually all of its case regarding Gray's murder during the guilt phase of [the Rockenbrant murder] trial" and that "a large part of the guilt phase of this case was devoted to evidence regarding Gray's murder." Even though there was substantial and convincing evidence on which a reasonable jury could have found defendant guilty of the Rockenbrant murder without the evidence of the Gray murder, we cannot say that there was little likelihood that the error in admitting other crime's evidence, so pervasive in this trial, affected the verdict. *See State v. Hansen*, 304 Or 169, 180, 743 P2d 157 (1987) (stating the standard for harmless error). The extensive reliance by the state on the Gray murder in this trial could have affected the verdict and, therefore, was not harmless. Reversal is required.

Because an issue concerning the indictment will arise on retrial, we address it here. Defendant demurred to the count of the indictment that charged him with aggravated murder under ORS 163.095(2)(b), which makes murder a capital offense if "[t]he defendant was confined in a state, county or municipal penal or correctional facility or was otherwise in custody when the murder occurred." Defendant asserts that the term "otherwise in custody" is unconstitutionally vague, in violation of several state and federal constitutional provisions.[4]

■ A person does not have a valid claim that a statute is unconstitutionally vague merely because it may be difficult to discern the margins of the scope of the statute's reach when, applying the statute to the case at hand, the person's acts clearly fall within the undeniable reach of the statute. *State v. Farrar*, 309 Or 132, 183, 786 P2d 161 (1990); *State v. Robertson*, 293 Or 402, 411 n 8, 649 P2d 569 (1982); *Village of Hoffman Estates v. Flipside, Hoffman Estates*, 455 US 489, 102 S Ct 1186, 71 L Ed 2d 362 (1982). In this case, defendant indisputably was "in custody" in April 1988, when Rockenbrant was killed. Defendant had voluntarily transferred from imprisonment at the state penitentiary to confinement at the state hospital during the term of his imprisonment. He had not yet reached his parole release date. During closing argument in the guilt phase of the trial, defendant's own counsel stated that defendant was an "inmate" and was "in custody."

■ Defendant's conduct falls clearly within the statutory reach of ORS 163.095(2)(b), which aggravates a murder committed while confined or "otherwise in custody." *See State v. Langley*, 314 Or 247, 256, 839 P2d 692 (1992) (a defendant who is in custody of a correctional facility but who

---

[4] Defendant relies on the following provisions of Article I of the Oregon Constitution: section 11 (fair notice), section 16 (proportionality), section 20 (privileges or immunities), and section 21 (no *ex post facto* laws). Defendant also relies on the Due Process, Equal Protection, and Equal Privileges and Immunities Clauses of the United States Constitution.

Defendant also asserted at trial that the term "confined" is unconstitutionally vague, in reliance on the same provisions. Defendant was acquitted of the count of the indictment charging him with murder while confined (Count I). To the extent that defendant reiterates that argument on appeal, it is that the referent "confined" is vague and so is the alternative term "or was otherwise in custody."

is not physically confined there is "otherwise in custody"). He cannot, accordingly, succeed in his assertion that the prohibitions of the statute are unconstitutionally vague as to some other defendant in some other case. There was no error as argued.

Admission of the evidence of the Anne Gray murder to prove defendant's identity as the murderer of Larry Rockenbrant was reversible error.

The judgments of conviction for aggravated murder are reversed, and the case is remanded to the circuit court for a new trial.