Sohail MASOOD,
*Plaintiff-Appellant*
*Cross-Respondent,*

*v.*

SAFECO INSURANCE COMPANY
OF OREGON,
an Oregon Insurance company;
*Defendant-Respondent*
*Cross-Appellant,*

*and*

OVERLAND SOLUTIONS, INC.,
*Defendant-Respondent,*

*and*

A. O. A. WEST, INC.,
an Oregon Corporation,
*Defendant.*

Sohail MASOOD,
*Plaintiff-Appellant*
*Cross-Respondent,*

*v.*

SAFECO INSURANCE COMPANY
OF OREGON,
an Oregon insurance company,
*Defendant-Respondent*
*Cross-Appellant,*

*and*

A. O. A. WEST, INC.,
*Defendant.*

Clackamas County Circuit Court
CV09070070, CV10060761;
A149925 (Control), A149926

365 P3d 540

Sara Kobak argued the cause for appellant-cross-respondent. With her on the brief were David Axelrod, W. Michael Gillette, and Schwabe, Williamson & Wyatt, P.C. With her on the reply brief were David Axelrod, Abra T. Cooper, and Schwabe, Williamson & Wyatt, P.C.

Jonathan W. Henderson argued the cause for respondent. With him on the brief were William Davis and Davis Rothwell Earle & Xòchihua, P.C.

R. Daniel Lindahl argued the cause for respondent-cross-appellant. On the brief were Janice C. Puracal, Jerret E. Sale, Washington, John A. Bennett, Stuart D. Jones, and Bullivant Houser Bailey PC. On the reply brief were Jerret E. Sale, Washington, John A. Bennett, and Bullivant Houser Bailey PC.

Before Armstrong, Presiding Judge, and Nakamoto, Judge, and Egan, Judge.

NAKAMOTO, J.

## NAKAMOTO, J.

This is a complex civil case that arose after a fire destroyed plaintiff's multi-million dollar home and its contents. Plaintiff brought a breach-of-contract claim against his insurer, Safeco, for failing to pay him the "extended dwelling coverage" under his insurance policy based on an oral settlement agreement that he made with Safeco (the fire-loss claim), and for failing to pay on a claim for a theft that plaintiff alleged occurred after the fire (the theft-loss claim). Plaintiff also brought a negligence claim against Overland Solutions, Inc., a company that prepared a replacement-cost estimate of plaintiff's home for Safeco before the fire. Safeco brought a counterclaim against plaintiff for breach of contract based on its contention that plaintiff had willfully misrepresented the quality and value of three built-in components in his home. The trial court granted Overland's motion for summary judgment on plaintiff's negligence claim, and the case proceeded to trial on plaintiff's and Safeco's respective claims for breach of contract.[1]

After a lengthy trial, the jury determined that Safeco had breached an oral settlement agreement with plaintiff on his fire-loss claim and that plaintiff's damages were $2,452,500, but it found in favor of Safeco on plaintiff's theft-loss claim. The jury also determined that plaintiff had willfully misrepresented the three house components and that Safeco had relied on those misrepresentations. After hearing the parties' post-trial arguments on the effect of the jury's findings, the trial court concluded that, based on public policy reasons, plaintiff "shall take no damages" under the judgment on his breach-of-contract claim. The trial court also determined that plaintiff's misrepresentations voided the insurance contract as of the day before the fire and that Safeco was entitled to a judgment of $9,977,290.78, which was the amount of payments Safeco had made to plaintiff on his fire-loss claim under the policy.

On appeal, plaintiff asserts 12 assignments of error, and Safeco asserts three cross-assignments of error and

---

[1] In the trial court, this case included additional parties, claims, and cross-claims. We discuss in this opinion only those parties and claims that are relevant to plaintiff's appeal and Safeco's cross-appeal.

brings a cross-appeal asserting a single assignment of error. We first address plaintiff's second and third assignments of error and conclude that the trial court erred in denying plaintiff's motion for directed verdict on Safeco's breach-of-contract counterclaim because there is no evidence in the record that Safeco reasonably relied on the misrepresentations that the jury found plaintiff had made to Safeco. Based on that disposition, we need not address plaintiff's fourth through ninth assignments of error, nor Safeco's third cross-assignment of error. That disposition also renders moot Safeco's cross-appeal of the trial court's denial of prejudgment interest on its money judgment against plaintiff.

On plaintiff's first assignment of error, challenging the trial court's decision that plaintiff "shall take no damages" under the judgment on his fire-loss claim, we conclude that (1) the trial court erred in concluding that the settlement contract was void as against public policy and (2) the disposition of Safeco's counterclaim disposes of Safeco's other arguments in support of the judgment. On Safeco's related first and second cross-assignments of error, we conclude that the trial court did not err in denying Safeco's motions for directed verdict on plaintiff's fire-loss claim.

In plaintiff's tenth and eleventh assignments of error, he challenges the trial court's admission of evidence of a United Kingdom court's findings that plaintiff had forged documents in an unrelated case. Because of our dispositions on Safeco's counterclaim and plaintiff's fire-loss claim, those assignments of error relate only to plaintiff's theft-loss claim. With respect to the theft-loss claim, we conclude that the trial court did not err in admitting that evidence and did not err in excluding plaintiff's evidence offered to rebut the United Kingdom court's findings. Accordingly, we affirm the judgment for Safeco on plaintiff's theft-loss claim.

Finally, in his twelfth assignment of error, plaintiff challenges the trial court's grant of summary judgment to Overland. We conclude that the trial court did not err in concluding that plaintiff's claim was barred by the economic loss doctrine.

Accordingly, we reverse the judgment for Safeco on its breach-of-contract counterclaim, vacate and remand the

judgment for plaintiff on his fire-loss claim with instructions to enter a judgment for plaintiff in the amount of the jury's award, dismiss Safeco's cross-appeal as moot, and otherwise affirm.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

On appeal, this case involves two different claims, the fire-loss claim and the theft-loss claim, that plaintiff brought against his insurer, Safeco; Safeco's counterclaim for breach of contract against plaintiff based on fraud;[2] and plaintiff's negligence claim against Overland. The background facts with respect to those claims are set out separately below, although the timeframe of the applicable facts largely occurred concurrently. In addition to the background facts set out here, we also discuss particular evidence in more detail in the analysis that follows.

In stating the background facts, with respect to those claims that went to the jury, we view the evidence, and the reasonable inferences taken from that evidence, in the light most favorable to the party that prevailed below on each claim. *See Greist v. Phillips*, 322 Or 281, 285, 906 P2d 789 (1995) ("Because this case comes to us after a trial at which the jury found in plaintiff's favor, we view all the evidence, and the inferences that reasonably may be drawn from it, in the light most favorable to plaintiff."). With respect to the grant of summary judgment to Overland, we review the summary judgment record in the light most favorable to plaintiff, the nonmoving party, and draw all reasonable inferences in his favor. *Jones v. General Motors Corp.*, 325 Or 404, 408, 939 P2d 608 (1997).

### A.   *Plaintiff's House and Property*

Plaintiff owned a 20-acre parcel in West Linn that included an approximately 12,600 square-foot house and several additional buildings and structures. Plaintiff and his family used the house as a residence, and plaintiff also worked from there and hosted international guests. The

---

[2] Safeco also asserted an affirmative defense based on plaintiff's fraud. However, because the judgment was entered for Safeco based on its counterclaim, we refer only to Safeco's counterclaim throughout this opinion.

house was built in 1994 as a "spec" house; that is, it was built without a prospective owner, so it did not have custom features. Plaintiff purchased the house in 1996 and, over four years, extensively renovated the house and added a large expansion. As part of the renovation, an audio/visual system was integrated into the home. After the renovation, the interior of the house included high-end finishes, custom fixtures and furnishings, murals, and artwork.

### B. *Plaintiff's Negligence Claim against Overland*

Plaintiff obtained insurance for his house from Safeco through AOA West, Inc., an independent insurance agency, and had done so since 1998.[3] Safeco had a contract with Overland to conduct real estate inspection appraisal services and, in April 2008, requested that Overland provide a replacement-cost estimate for plaintiff's house. Based on an inspection by its agent, Teri DeHaan, Overland reported the replacement-cost value of plaintiff's house at $4.905 million. Under Safeco's flat-fee arrangement with Overland, Safeco paid Overland $215 for its report.

Jason Rogers, from AOA West, obtained a copy of that report from Safeco and then forwarded it to plaintiff. Plaintiff objected to the report to Rogers because he believed it significantly undervalued his house. However, at a meeting on August 5, 2008, plaintiff increased his policy limits with Safeco to match Overland's reported value, as recommended by Rogers, because Rogers told him that that was the maximum coverage he could get. Four days later, on August 9, 2008, plaintiff's home was destroyed by a fire while subject to the policy limits set on August 5.

In his claim against Overland, plaintiff contended that its negligently prepared appraisal left him significantly underinsured, and he sought millions of dollars in damages for the underinsured amount. Before trial, the trial court granted summary judgment to Overland, concluding that plaintiff's claim was barred by the economic loss doctrine because plaintiff and Overland did not have a special relationship that gave rise to an enhanced duty of care.

---

[3] AOA West was a defendant at trial but is not a party on appeal.

## C. *Claims Related to the Fire Loss of Plaintiff's House*

### 1. *Plaintiff's fire-loss claim against Safeco*

The fire on August 9, 2008, caused a complete loss to plaintiff's house and its contents and damaged other structures on the property. Shortly after the fire, plaintiff began working with Safeco's adjustors to resolve his fire-loss claim. The coverage available to plaintiff under his insurance policy included (1) Coverage A-Dwelling of $4,905,000, (2) Coverage B-Other Structures of $1,378,400, (3) Coverage C-Personal Property of $3,678,750, (4) Coverage D-Loss of Use of up to 12 months, and (5) Extended Dwelling Coverage (EDC) of 50 percent of the Coverage A limit ($2,452,500).

In the week following the fire, plaintiff met with Safeco's large-loss adjustor, Trevor Evans, several times. Evans was designated as plaintiff's Safeco contact, although other Safeco adjustors also worked on plaintiff's claim, including Chris Pratt, who was the control adjustor for plaintiff's entire claim. On August 15, 2008, plaintiff and Evans met and came to an agreement about some of the policy coverages. Evans confirmed the agreement in a letter to plaintiff, dated August 18, 2008, which provided, in part:

> "All payments for the dwelling (coverage A), other structures (coverage B), and personal property (coverage C) will all be paid at full replacement cost without deduction for depreciation. After the replacement cost value has been established the full amount of the replacement cost will be paid without deductions."

Safeco and plaintiff disagreed over whether Safeco had agreed to pay the EDC as part of Coverage A. At issue at trial was whether part of the oral agreement between plaintiff and Evans included Evans, on Safeco's behalf, agreeing to pay the full dwelling coverage, consisting of the Coverage A-Dwelling *and* the EDC, after confirming the replacement cost of the house, and without first requiring actual replacement of the house (the EDC Settlement).[4]

---

[4] Plaintiff and Safeco also agreed to a lump sum payment for Coverage D-Loss of Use, which was finalized in a separate, written agreement. That agreement and payment are not at issue on appeal.

While the determination of the replacement cost of the house was beginning, as discussed below, on October 30, 2008, Safeco advanced $3,774,900.16 to plaintiff under Coverage A-Dwelling. With that payment, Safeco included a letter that provided, in part:

"It has been brought to my attention that Trevor Evans of Safeco wrote to [plaintiff] on August 18, 2008, quoting portions of the Loss Settlement language related to replacement cost. Mr. Evans' letter could be understood to express that replacement cost on the dwelling would be paid without actual repair or replacement of the dwelling. Whether Mr. Evans meant to make this statement, or whether [plaintiff] understood that replacement cost on the dwelling would be paid without actual replacement, that is not the case. The Loss Settlement language makes clear that the dwelling must be repaired or replaced to qualify for the replacement cost coverage."

After Safeco continued to refuse to pay the EDC without plaintiff first replacing the home, plaintiff brought his fire-loss action to recover the EDC under the EDC Settlement. That claim went to the jury on a special verdict.

In the special verdict, the jury found that "Safeco adjustor Trevor Evans form[ed] a new contract with [plaintiff] to settle the fire loss claim, that included a term for payment of Extended Dwelling Coverage without requiring [plaintiff] to replace his home," that Safeco breached that contract by October 30, 2008, and that plaintiff's damages from the breach were $2,452,500 (the policy limits on the EDC).

### 2. *Safeco's counterclaim based on fraud against plaintiff*

For context, we start with Safeco's allegations and the jury's findings before discussing the background facts relevant to Safeco's counterclaim. Before trial, Safeco narrowed its counterclaim against plaintiff, alleging that plaintiff had made material misrepresentations about three fixtures in his home: the foyer and dining room chandeliers, the kitchen cabinetry, and the audio/visual system. The jury found that plaintiff had made willful misrepresentations as to all three of those fixtures, that the earliest of those misrepresentations occurred between November 5, 2008 and

July 1, 2009, and that Safeco relied on each of those misrepresentations. With that context in mind, we turn to the facts leading up to the jury's verdict.

In the first week following the fire, Evans requested that plaintiff provide an inventory of the contents and fixtures in the house to assist in determining the loss. Plaintiff suggested that his former girlfriend, Tracy Brophy, who had helped with some of the renovations and furnishing of the home, could prepare an initial inventory for Safeco's review. In June 2008, plaintiff had had a panoramic video (the 360 video) of the house created to market the house for sale. The night before Brophy met with Safeco's personal property adjustor, Mike Lewis, Brophy prepared an inventory based on the 360 video that included her "best guesstimate" on values, as requested by Lewis. Plaintiff did not assist Brophy with the inventory and reviewed it only sometime after Brophy gave it to Lewis. After preparing the inventory, Brophy met with Lewis and reviewed it with him along with the 360 video. The inventory included more than $4.7 million in personal property and more than $1.5 million in fixtures. After concluding that the personal property loss exceeded plaintiff's policy limits, Safeco paid to plaintiff the policy limits of Coverage C-Contents ($3,678,750) on August 28, 2008.

Also in August, Evans recommended to Safeco that it set the reserves for plaintiff's claim at the policy limits because he believed plaintiff's loss to be at or over those limits, including the EDC. Chris Morgan, the unit manager for the claim, agreed and initially set the reserves at policy limits. However, two days later, Safeco reduced its reserves for the EDC to $1 million, although the rest of the coverage reserves remained the same.

In September 2008, Safeco brought in TC3 Construction Services to create a replacement-cost estimate for plaintiff's home, which was handled by TC3's president, Paul Nilles. Evans gave Nilles photographs of the house, an appraisal of the house with photographs, a building footprint, blueprints of the original house and the addition, and the 360 video to work from. The first printed version of Nilles's report, which Nilles prepared to create the initial inventory or "scope of loss," was created on September 26,

2008. Nilles updated that report on September 30 after receiving Brophy's inventory from Evans. Among the items that Nilles added were the built-in audio/visual system, valued at $455,000 using Brophy's "guesstimate," the foyer chandelier, valued at $40,000 using Brophy's "guesstimate," and three dining room chandeliers, to which Nilles's software gave a default value of $12,000 each. Nilles, who has expertise in valuing chandeliers, questioned the $40,000 value for the one in the foyer, but he used the number to develop the initial scope until he could obtain more information. However, Nilles never did try to verify the value of the chandeliers. The September 30 report estimated a total replacement cost of $4,114,814.

Evans shared the September 30 report with plaintiff, who commented that some rooms were missing and several other rooms were missing standard finishes, such as drywall, paint, light fixtures, and floor tile. Nilles updated his report on October 23 to add some of those items, which resulted in a total valuation of $4,819,749. Nilles then met with plaintiff for the first time on October 28, 2008;[5] that meeting was primarily an introduction and did not result in any substantive changes to Nilles's report. At that meeting, Nilles told plaintiff that TC3 would not accept any of plaintiff's valuation numbers without independent verification. As previously noted, Safeco advanced plaintiff $3,774,900.16 of the Coverage A-Dwelling on October 30, 2008.

Soon thereafter, independent of any values offered by plaintiff, both Nilles and another Safeco-hired appraiser estimated that plaintiff's loss was higher. Nilles provided another updated report on October 31, which estimated a total replacement cost of $5,950,528—over $1 million above plaintiff's base dwelling coverage. Nilles testified that, as of October 31, 2008, the values in the report contained no input from plaintiff. Evans prepared a depreciated value based on Nilles's report that showed a cash value of plaintiff's home of $5.1 million. Safeco also hired PGP Valuation, Inc. to prepare a market-value appraisal of plaintiff's home, which valued plaintiff's loss at $7.53 million.

---

[5] In September 2008, plaintiff experienced significant health problems, which limited his ability to be involved with the claims process for a time.

On December 10, 2008, Safeco determined that it was clear, using either PGP's fair market value or replacement value with depreciation, that the actual cash value of plaintiff's loss exceeded the base coverage under Coverage A-Dwelling. As previously noted, Safeco had advanced plaintiff $3,774,900.16 of the Coverage A-Dwelling on October 30, 2008.[6] On December 11, Safeco tendered the remainder of that base coverage to plaintiff, which was $1,129,600.84.[7]

Beginning in January 2009, plaintiff disputed parts of Nilles's report, pointing out missing items and asserting that he had paid significantly more than listed for other items. On January 28, 2009, Nilles met with plaintiff at the property for a site inspection and to discuss the report. In that meeting, plaintiff asserted that the foyer chandelier was an antique and significantly undervalued and that the audio/visual system was also undervalued. Nilles asked for any details or documentation that plaintiff could provide. Plaintiff followed up by email, asserting that replacement audio/visual system would be $1.8 million and that replacement cabinetry for the house would be $1.5 million.

Nilles did not accept plaintiff's valuation for the cabinetry, concluding that it was too high. To accommodate plaintiff—in Nilles's words, giving him "the benefit of the doubt"—Nilles upgraded the quality of the kitchen cabinetry, which increased the price per linear foot, resulting in an overall increase of approximately $100,000 on the kitchen cabinetry, for a total of $186,259. Nilles testified that he had to rely on plaintiff about the quality of the kitchen cabinetry, but he also testified that, based on photographs, he did not think the quality was as good as represented by plaintiff and that he believed that the number he gave plaintiff as "the benefit of the doubt" was "considerably high" and "unreasonable." Evans likewise testified that he thought at the time that plaintiff's kitchen cabinet valuation was more than he had ever seen for a high-end house.

---

[6] Safeco also made an earlier dwelling payment of $499 to plaintiff related to the septic system.

[7] Based on plaintiff's request, Safeco did not pay that amount to him until later. However, Safeco does not dispute that it committed to making that payment in December 2008.

Plaintiff also obtained a bid for a replacement audio/visual system from Myriad, an installer of home entertainment systems. Myriad's bid was based on a review with plaintiff of the 360 video and plaintiff's representations of what was in the house before the fire. That bid came to $2,116,393, which plaintiff forwarded to Evans and Nilles on February 13, 2009.

Also on February 13, Nilles provided an updated report that contained a total valuation of $7,983,935, which was more than $600,000 above the policy limits on the combined dwelling base coverage and the EDC. That report did not increase the value on the foyer or dining room chandeliers from their original placeholder values and did not increase the value of the audio/visual system from the original value of $455,000, but did include the increase of $100,000 for the kitchen cabinetry. The remainder of the $2 million increase in value from the October 31, 2008, report relates to aspects of the home as to which Safeco did not allege that plaintiff had made misrepresentations.

After receiving the February 13 report, plaintiff responded that the report was still missing items and that other valuations were still wrong, including that the foyer and dining room chandeliers should be $249,000, that the kitchen cabinetry should be $600,000, and that the audio/visual system was off by $1 million. Nilles responded that, now that the scope of loss for the report was complete, he would continue to work on the numbers and have a sound system expert verify the costs for the audio/visual system. Evans authorized Nilles to hire James Malee to work up the valuation for the sound system, the security system, and the phone system. Nilles testified that the purpose of hiring Malee was to develop independent numbers for those components. Evans testified that it is usual practice to hire a company with expertise for those types of components.

In March 2009, Safeco increased its reserves on plaintiff's claim to cover the policy limits of the EDC based on Nilles's information.

In April 2009, Malee finished an estimate for the sound system, security system, and telephone system. The portion of the report for the sound system was based on the

components listed in the Myriad bid and came to $1,793,750. Evans authorized Nilles to include Malee's number in his report.

Nilles then provided an updated report on April 30, 2009, that had a total valuation of $9,836,768, which included Malee's sound system number (along with his security and telephone systems numbers), but did not include any changes to the chandelier or kitchen cabinetry valuations. At that point, Safeco told Nilles to stop work because the replacement-value estimate far exceeded plaintiff's policy limits. Nilles never finished his report with final valuations, and Safeco never came to an agreement with plaintiff on the final estimate. Safeco paid Nilles a total of $60,000 for all of his work, and Malee a total of $20,000 for all of his work.

As of February 2010, Safeco also had paid to plaintiff a total of $1,070,280 of Coverage B-Other Structures. About a year after plaintiff filed his fire-loss claim, in May 2010, Safeco asserted a counterclaim against plaintiff for breach of contract based on plaintiff misrepresenting the value of his home. At trial, the jury found, using the special verdict form, that plaintiff, or his agent, had intentionally and materially misrepresented that (1) "one or more chandeliers in his entry or dining room were antiques, or had a particularly high value, when they did not," (2) "the kitchen cabinetry was of a cost, quality, or makeup that it was not, or had a value that it did not," and (3) "the stereo and audio/visual equipment in the dwelling at the time of the fire was of a quality, quantity, and value that it was not, and what it would cost to replace that equipment with current components of like kind and quality"; that the earliest timeframe of those misrepresentations was November 5, 2008 to July 1, 2009; and that Safeco relied on each of those misrepresentations to its detriment in responding to plaintiff's fire-loss claim.

### 3. *Post-trial rulings and entry of general judgment on the fire-loss claim and counterclaim*

After the jury's verdict, the parties submitted post-trial briefing to the trial court regarding the legal effect of the jury's findings and what form the resulting judgment

should take. As relevant on appeal, the trial court concluded (1) that enforcement of the EDC Settlement was not in the public interest and "[t]he jury award of damages for breach of the EDC settlement contract is voided by their finding of misrepresentation by [plaintiff]" and (2) based on plaintiff's misrepresentations, that, under ORS 742.208, plaintiff's policy is deemed void as of the day before the loss occurred, resulting in Safeco being entitled to, as damages, the amount of all payments it made to plaintiff on the fire loss. Accordingly, the trial court entered a general judgment (1) in favor of plaintiff on his fire-loss claim against Safeco, but providing that he "shall take no damages under that judgment," and (2) in favor of Safeco on its breach-of-contract counterclaim in the amount of $9,977,290.78.

D.  *Plaintiff's Theft-Loss Claim against Safeco*

In 2007, plaintiff moved property out of a vacation house located in Seaside that he had earlier sold. He had the contents of the house inventoried, packed, and stored in an outbuilding located on the West Linn property where the fire occurred.

In November 2008, several months after the fire, plaintiff noticed that some of the stored items appeared to be missing. After learning that the caretaker had discovered broken locks on the building about a month after the fire, plaintiff notified Safeco that there may have been a theft after the fire. Plaintiff also made a report to law enforcement as requested by Safeco. At that time, plaintiff estimated the loss to be about $571,000.

Plaintiff then had the stored items compared to the original inventory. Plaintiff claimed that the comparison showed missing items that were stolen and forwarded a list of those items to Safeco in early 2009. Plaintiff filed a proof of loss for the theft in March 2009, claiming a loss of $3,674,000. Following that update, plaintiff and Safeco had an extended dispute about the investigation of the claim and information Safeco was requiring before it would either accept or deny that claim.

After Safeco continued to neither accept nor deny the claim, in June 2010, plaintiff filed an action against

Safeco for payment of the theft-loss claim. The trial court consolidated plaintiff's action on the theft-loss claim with his action on his fire-loss claim. At trial, the jury determined that plaintiff had not proved that he had lost personal property to theft after the fire.

## II. DETRIMENTAL RELIANCE

Because our disposition of it obviates the need to address several of the parties' other assignments of error, we begin with plaintiff's second assignment of error, which challenges the trial court's denial of plaintiff's motion for a directed verdict on Safeco's counterclaim for breach of contract.[8] We conclude that the trial court erred in denying plaintiff's motion for directed verdict because there is no evidence in the record from which a reasonable jury could conclude that Safeco reasonably relied on the misrepresentations that the jury found plaintiff had made to Safeco.

In reviewing the denial of plaintiff's motion for directed verdict, "we will not set aside a jury verdict 'unless we can affirmatively say that there is no evidence from which the jury could have found the facts necessary to establish the elements of [Safeco's] cause of action.'" *Conway v. Pacific University*, 324 Or 231, 235, 924 P2d 818 (1996) (quoting *Brown v. J. C. Penny Co.*, 297 Or 695, 705, 688 P2d 811 (1984)). We view the evidence, including all reasonable inferences, in the light most favorable to Safeco. *Najjar v. Safeway, Inc.*, 203 Or App 486, 489-90, 125 P3d 807 (2005).

In its counterclaim for breach of contract, Safeco alleged that plaintiff made material misrepresentations to it "concerning the value, quality, cost, and origin of components of the dwelling in an attempt to falsely inflate the replacement cost of the dwelling." In a later letter, Safeco clarified the basis for its counterclaim and alleged that plaintiff made misrepresentations about the quality and

---

[8] Plaintiff's third assignment of error to the denial of his motion for judgment notwithstanding the verdict on the same ground is subsumed within his assignment of error to the denial of his motion for directed verdict. *Najjar v. Safeway, Inc.*, 203 Or App 486, 489, 125 P3d 807 (2005).

value of the foyer and dining room chandeliers, the kitchen cabinetry, and the audio/visual system.[9]

Safeco's counterclaim implicates ORS 742.208, which requires a fire insurance policy to contain a provision regarding when a policy is void because of an insured's misrepresentations. That statute provides, in relevant part,[10] that a fire-insurance policy must contain the following provision:

> "(1)   Subject to subsections (2) and (3) of this section, this entire policy shall be void if, whether before or after a loss, the insured has willfully concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof, or the interest of the insured therein, or in case of any fraud or false swearing by the insured relating thereto.

> "* * * * *

> "(3)   In order to use any representation by or on behalf of the insured in defense of a claim under the policy, the insurer must show that the representations are material and that the insurer relied on them."

ORS 742.208. Thus, an insurance company relying on that voiding provision must prove that, among other things, it relied on the insured's misrepresentations. Plaintiff moved

---

[9]   More specifically, in that letter, Safeco alleged as follows:

(1) "Misrepresentations were made that the light fixtures in the dining room and in the entry way were antiques," and "the value of those light fixtures was substantially exaggerated." Safeco alleged that "[t]he misrepresentations were made initially to Mike Lewis by Tracy Brophy. [Plaintiff] affirmed the misrepresentations to Paul Nilles and to Trevor Evans, and further inflated the claimed values to Mr. Nilles and Mr. Evans."

(2) "[Plaintiff] misrepresented facts concerning the cost, quality, and renovation of the kitchen cabinetry and exaggerated the value of those cabinets to both Paul Nilles of TC3 and to Safeco's Trevor Evans."

(3) "[Plaintiff] misrepresented facts concerning the stereo and audio visual equipment in the dwelling at the time of the fire, and exaggerated the quality, quantity, and value of the stereo and audio visual equipment that was in the house[.]"

Safeco alleged that plaintiff made the misrepresentations concerning the stereo and audio equipment to Nilles, Malee, and Evans.

[10]   Plaintiff's policy contained a provision that contained some, but not all, of the required terms of ORS 742.208. However, Safeco does not challenge that it was required to prove all of the elements set out in ORS 742.208 for its breach-of-contract counterclaim against plaintiff.

for a directed verdict on Safeco's counterclaim on the ground, among others, that Safeco presented no evidence that it relied on plaintiff's misrepresentations.

We have previously construed the term "reliance" in ORS 742.208 and concluded that the legislature intended that term to mean reliance as that term is understood as an element of common-law fraud. *Eslamizar v. American States Ins. Co.*, 134 Or App 138, 143, 894 P2d 1195, *rev den*, 322 Or 228 (1995). Thus, the insurer must establish "evidence of a detrimental action or change in position." *Id.* at 146. Reliance in fact cannot be proved by asserting, in general, that the insurer relied on an insured to ascertain a loss. Rather, the insurer must show that it changed its position in some way based on the misrepresentation made. *Id.*

In addition, an insurer's actual detrimental reliance must be reasonable or justified under the circumstances. That follows from the reliance required for a common-law fraud claim. *See, e.g., OPERB v. Simat, Helliesen & Eichner*, 191 Or App 408, 428, 83 P3d 350 (2004) (to prove common-law fraud, a party must establish that its reliance on a misrepresentation was reasonable); *see also Story v. Safeco Life Ins. Co.*, 179 Or App 688, 693-94, 40 P3d 1112 (2002) (under life insurance policy statute, explaining that reliance has three components: as a factual matter, both reliance in fact and justified reliance given facts known to the insurer, and, as a legal matter, the insurer's right to rely on the misrepresentations). Whether reliance is justified requires consideration of the "totality of the parties' circumstances and conduct," which includes whether the party claiming reliance took "reasonable precautions to safeguard his or her own interests." *Vukanovich v. Kine*, 268 Or App 623, 635, 342 P3d 1075, *adh'd to as modified on recons*, 271 Or App 133, 349 P3d 567 (2015) (brackets omitted); *accord OPERB*, 191 Or App at 428; *Gregory v. Novak*, 121 Or App 651, 655, 855 P2d 1142 (1993). The reasonable precautions a party must take "turns on the nature of the person's relationship with the person making the alleged misrepresentation, and that person's experience and sophistication with the type of transaction at issue, as well as with the subject matter of the misrepresentation." *Vukanovich*, 268 Or App at 635.

Here, the jury made specific findings in its special verdict that frame our analysis. As set out above, the jury found that plaintiff, or his agent, had intentionally and materially misrepresented that (1) "one or more chandeliers in his entry or dining room were antiques, or had a particularly high value, when they did not," (2) "the kitchen cabinetry was of a cost, quality, or makeup that it was not, or had a value that it did not," and (3) "the stereo and audio/visual equipment in the dwelling at the time of the fire was of a quality, quantity, and value that it was not, and what it would cost to replace that equipment with current components of like kind and quality"; that the earliest timeframe those misrepresentations occurred was November 5, 2008 to July 1, 2009; and that Safeco relied on each of those misrepresentations to its detriment in responding to plaintiff's fire-loss claim.[11] Hence, the question we must answer is whether Safeco presented any evidence from which the jury could reasonably find that Safeco had justifiably taken "a detrimental action or change in position" based on any of those three misrepresentations, which the jury found were made sometime between November 5, 2008 and July 1, 2009.

In its briefing, Safeco points to the following as evidence sufficient to support the jury's finding of reliance: (1) the jury could infer that plaintiff's misrepresentations about the chandeliers prevented Nilles from learning that Brophy's numbers were too high; (2) Nilles increased the valuation of the kitchen cabinetry based on plaintiff's misrepresentations; (3) Malee relied on plaintiff regarding the components of the audio/visual system in creating his bid; (4) Safeco incurred all of Malee's fee and a portion of Nilles's fee in response to plaintiff's misrepresentations; (5) Safeco increased its reserves based on information from plaintiff; (6) Evans's testimony that there was nothing left of the house so they had to rely on plaintiff and that "we relied on the information that [plaintiff] gave us"; and (7) Pratt's testimony that Safeco made payments in reliance on plaintiff. As to Pratt's testimony, to which Safeco points repeatedly, that testimony, in full, was as follows:

---

[11] We note that there were no jury instructions on agency that could apply to plaintiff and the jury was instructed that Safeco had to prove that plaintiff, with no mention of an agent, made a misrepresentation.

> "Q. Before that time [when Safeco learned of plaintiff's misrepresentations], had Safeco made the payments that you've discussed that are evidenced on Exhb. 1036 A in reliance, at least in part, on what [plaintiff] had presented to it?
>
> "A. Yes."

At oral argument, Safeco confirmed that its evidence of reliance was that (1) Safeco had to rely on plaintiff because the house was completely gone and his misrepresentations confirmed its prior decision to make the Coverage A-Dwelling payment; (2) Pratt testified that Safeco relied on plaintiff for its payment decision; (3) Malee was hired to respond to the Myriad bid on the audio/visual system and he had to rely on plaintiff for what that system was; (4) Nilles incorporated numbers from plaintiff and did not go over policy limits until after plaintiff's misrepresentations; (5) Nilles had to spend time responding to plaintiff's misrepresentations; and (6) Safeco increased its reserves after plaintiff's misrepresentations. Safeco conceded at oral argument that there was no evidence in the record as to what portion of Nilles's fee could be attributed to responding to plaintiff's misrepresentations.

Initially, we reject Safeco's contention, apparent from some of its factual points, that it generally had to rely on plaintiff's representations about the chandeliers, kitchen cabinetry, and the audio/visual system because the house was gone, a variant of the argument that we rejected in *Eslamizar*.[12] Instead, we turn to the record, particularly the evidence to which Safeco points, to determine whether there was evidence of Safeco's actual and reasonable reliance with respect to each misrepresentation that the jury found that plaintiff had made to Safeco.

A. *Chandeliers*

With respect to the foyer and dining room chandeliers, we easily conclude that Safeco presented no evidence

---

[12] We also reject Safeco's argument that it proved detrimental reliance based on its contention that plaintiff's misrepresentations confirmed decisions that Safeco made before plaintiff made those misrepresentations. Safeco did not present evidence at trial that supports that assertion, nor does Safeco explain how, under our case law, that could constitute detrimental reliance under the facts of this case.

that it took a detrimental action or made a change in position based on plaintiff's misrepresentations about the chandeliers. As set out in our discussion of the facts, Nilles adopted the valuation number of $40,000 for the foyer chandelier from Brophy's "guesstimate" in her inventory and independently provided his own valuation of $12,000 for the dining room chandeliers when building his initial scope of loss for plaintiff's house. The jury did not find that Brophy's August 2008 inventory contained misrepresentations, having concluded that plaintiff's earliest misrepresentation was between November 2008 and July 2009.

Nilles also testified that, based on his expertise with valuing chandeliers, he questioned the $40,000 value, but he used it until he could get more information. Despite that, Nilles testified that he did not change his valuation at any time and did not undertake any investigation of the value of the chandeliers. Safeco did not present any evidence that it made any payment decisions, increased reserves, or paid Nilles more than it otherwise would have without plaintiff's misrepresentations about the chandeliers.

B. *Kitchen Cabinetry*

As for plaintiff's misrepresentations about the kitchen cabinetry, Safeco's theory of detrimental and reasonable reliance is that one appraiser, Nilles, increased the valuation of the cabinetry and that Safeco increased its reserves and paid plaintiff because plaintiff had inflated the value of the cabinets. However, we conclude that Safeco failed to present any evidence from which a jury could reasonably find that Safeco justifiably relied to its detriment on plaintiff's misrepresentations about the cabinets.

As set out in the fact section, there is evidence that Safeco reluctantly bumped up the valuation of the kitchen cabinets based on plaintiff's misrepresentations, but the evidence does not permit a finding of actual reliance, at least to the extent of plaintiff's inflation of the cost of the kitchen cabinetry. Both Nilles and Evans did not believe plaintiff's representations about how much he had paid for the kitchen cabinetry ($600,000) or cabinetry for the whole house ($1.5 million) because the numbers were too high to be reasonable. However, Nilles decided to give plaintiff "the

benefit of the doubt," so he increased the value of the kitchen cabinetry by $100,000 (based on an increase in price per linear foot) to arrive at a valuation of $186,259, a number that Nilles at the time believed was unreasonable. Nilles testified that he did not expend time investigating the quality of the kitchen cabinetry beyond looking at the photographs when he developed the initial scope. Thus, the testimony established that Safeco, as an accommodation, had adjusted the kitchen cabinetry valuation by a fraction of its value according to plaintiff and that Safeco's agents in fact disbelieved plaintiff's representation about the cost of the cabinetry.

And, although Safeco increased the valuation for the kitchen cabinetry, there was no evidence that, because of the increased valuation, Safeco suffered any detriment. The $100,000 increase in valuation of the cabinetry was part of an over $2 million increase in Nilles's replacement-cost estimate made between October 30, 2008 and February 13, 2009. Nilles's final estimate of the replacement cost of the dwelling was over $9.83 million. That figure was well above $7,357,500, the total amount of the limits under Coverage A and EDC available for the replacement of the dwelling. Safeco presented no evidence that that $100,000 accommodation to plaintiff—as opposed to the approximately $2 million increase in total replacement cost attributed to non-misrepresented items in the house—affected its payment or reserves decisions. Nor does Safeco muster evidence that it paid Nilles more than it otherwise would have without plaintiff's misrepresentations about the kitchen cabinetry. In addition, even if Safeco had presented such evidence, Safeco presented no evidence that that reliance in fact was justified given that both Nilles and Evans testified that, at the time they heard plaintiff's representations about the kitchen cabinetry, they believed those representations were unreasonable.

## C. *Audio/Visual System*

Finally, Safeco contends that it had to hire an appraiser with expertise, Malee, because of plaintiff's misrepresentations about the audio/visual system; that Malee

relied on plaintiff's misrepresentations; and that Safeco increased its reserves and made payments to plaintiff because of those misrepresentations. With regard to the audio/visual system, we likewise conclude that Safeco presented no evidence from which a reasonable jury could find that Safeco actually and justifiably relied to its detriment on plaintiff's misrepresentations.

The timeline of events is important to our conclusion that a jury could not find that Safeco relied on plaintiff's misrepresentations regarding the audio/visual system when making either payment or reserve decisions under the fire policy. On September 30, 2008, after receiving Brophy's inventory from Evans, Nilles initially added the audio/visual system to his report on replacement value of the dwelling based on Brophy's value of $455,000, which the jury found was not a misrepresentation. Nilles kept that value in his report up until the final version he produced on April 30, 2009. At that time, Nilles incorporated Malee's estimated value of $1,793,750, which was based on plaintiff's representations to Myriad about the nature of his system.

However, before April 30, 2009, Safeco had already made all dwelling payments under the policy, except for the EDC. Also before April 30, Safeco had increased its reserves on the EDC up to policy limits, based on Nilles's February 13, 2009, report. In that report, Nilles was already estimating a replacement-cost value of at least $600,000 over the policy limits for the dwelling.

In his final report of April 30, 2009, Nilles's total valuation of replacement cost for the dwelling was $9,836,768. That total included Malee's value for the audio/visual system (along with his security and telephone systems valuation), but it did not include any changes to the chandelier or kitchen cabinetry valuations. It was at that point that Safeco told Nilles to stop work because the replacement-value estimate far exceeded plaintiff's policy limits. However, without the incorporation of Malee's value, in other words, had Nilles retained the $455,000 valuation for the audio/visual system, Nilles's total valuation for replacement cost still would have been, $8,498,018—still well over the

$7.3 million policy limits for replacement of the dwelling under Coverage A and EDC. In sum, there was no evidence that Safeco detrimentally relied when it made its EDC reserve decision or when it made payments to plaintiff.

Safeco also argues that plaintiff's misrepresentations required it to hire Malee to investigate the audio/visual system in response to the Myriad bid provided by plaintiff. Safeco paid Malee a total of $20,000 for all of his work. The difficulty with Safeco's argument is that the record is devoid of evidence that Safeco expended funds or time investigating what it otherwise would not have. Malee was hired by Nilles, as authorized by Safeco, to prepare estimates for the telephone and security systems, as well as the audio/visual system. Nilles testified that he did not expend any time investigating the audio/visual system himself—*viz.*, he did not question plaintiff about the system and he did not question Malee about his report. Nilles testified that he had no expertise in those areas and needed Malee to develop independent numbers for those components; Evans testified that it is usual practice to hire a company with expertise for those types of components. Safeco did not provide any evidence that it would not have authorized Malee's work, except for plaintiff's misrepresentations, and, even if it had, Safeco did not present any evidence as to what portion of Malee's time or fee was devoted to investigating the audio/visual system, as opposed to the other systems.

In sum, Safeco did not present any evidence that linked a payment decision, a change in reserves, or investigation undertaken to the misrepresentations that the jury found plaintiff had made. Safeco's argument that it detrimentally relied on plaintiff's misrepresentations essentially boils down to the testimony of Evans that, in general, Safeco had to rely on plaintiff as to what was in the house because the house was destroyed and to the conclusory testimony of Pratt that, in general, Safeco relied on plaintiff's information in making its payment decisions. Again, however, the fact that an insurer must, in general, rely on an insured for information about a loss does not establish detrimental and reasonable reliance on a specific misrepresentation. *Eslamizar*, 134 Or App at 146.

Because we conclude that the trial court should have granted plaintiff's motion for directed verdict, we reverse the judgment for Safeco on its counterclaim.

## III.   THE EDC SETTLEMENT

We next turn to plaintiff's first assignment of error and Safeco's two related cross-assignments of error. Plaintiff asserts that the trial court erred when it refused to enter judgment on the jury's award of $2,452,500 to plaintiff for breach of the oral agreement regarding the payment of the EDC before plaintiff rebuilt the house, which, like the trial court, we term the EDC Settlement. In its cross-assignments of error, Safeco argues the trial court erred in failing to grant it a directed verdict on plaintiff's claim, asserting that the EDC Settlement was not a binding contract because the adjustment process was not complete.

As set out above, the jury determined that Safeco entered into an oral agreement with plaintiff to pay him the EDC without requiring plaintiff to first replace his house, that Safeco breached that agreement by October 30 2008, and that plaintiff was damaged in the amount of $2,452,500. The trial court entered judgment for plaintiff on his breach of contract claim, but it also concluded that plaintiff "shall take no damages under that judgment." In so concluding, the trial court relied on *Town of Newton v. Rumery*, 480 US 386, 107 S Ct 1187, 94 L Ed 2d 405 (1987), and determined that the EDC Settlement was not in the public interest because it "did not contain a benefit to Safeco that exceeded the speculative benefit of prevailing in a civil action." That is, because the EDC Settlement contemplated that Safeco would pay out the full policy limit under the EDC, the court reasoned that it "does not reflect any reduction to Safeco's maximum risk in a lawsuit on the EDC issue." In conclusion, the trial court stated, without further explanation, "[t]he jury award of damages for breach of the EDC settlement contract is voided by their finding of misrepresentation by [plaintiff]." As a result, the general judgment for plaintiff on his fire-loss claim provides that plaintiff "shall take no damages under that judgment because it was rendered unenforceable by the jury's verdict on Safeco's claim for breach of contract."

Based on our conclusion that the trial court erred in denying plaintiff's motion for directed verdict on Safeco's counterclaim, the trial court's final reasoning as expressed in the letter opinion and in the general judgment cannot stand. That is, the jury's finding of misrepresentation by plaintiff cannot void the jury's award of damages to plaintiff because the question of misrepresentation should never have reached the jury.

However, we briefly address whether the trial court erred in concluding that the EDC Settlement was unenforceable because it did not confer a benefit to Safeco. We do so because it appears that that may have been a reason, independent of Safeco's counterclaim, on which the trial court relied in its judgment. As explained below, we conclude that the trial court erred.

With regard to Safeco's cross-assignments of error, we conclude that the trial court did not err when it denied Safeco's motions for directed verdict. Accordingly, we vacate and remand the judgment on plaintiff's breach-of-contract claim with instructions to the trial court to enter a judgment for plaintiff that conforms to the jury's verdict award of damages to plaintiff.

## A. *Plaintiff's First Assignment of Error*

Challenging the trial court's reasoning below, plaintiff argues that the federal rule in *Rumery*, governing when settlements are void as against public policy, does not apply here and that no similar rule, as applied by the court, exists in Oregon law. Further, plaintiff points out that Safeco never argued that it received no consideration for the oral agreement and that, contrary to the trial court's determination, Safeco did obtain a benefit from entering into the EDC Settlement in the form of reduced administrative costs. Safeco, for its part, does not defend the trial court's reasoning.[13]

---

[13] Safeco makes only "right-for-the-wrong-reason" arguments in support of the trial court's conclusion that plaintiff's misrepresentations voided the EDC Settlement. Our conclusion that the trial court should have directed a verdict for plaintiff on Safeco's counterclaim disposes of those arguments on appeal.

Plaintiff is correct. In *Rumery*, the settlement at issue was an arrestee's release of federal civil rights claims that he might have asserted under 42 USC section 1983 in exchange for the dismissal of the criminal charges lodged against him (known as "release-dismissal agreements"). 480 US at 390-91. The Court in *Rumery* rejected a *per se* rule of invalidity for release-dismissal agreements and concluded that whether such agreements are void as against public policy is to be determined under established federal common-law principles, because they implicate the release of a federal right. The relevant federal principle is that "a promise is unenforceable if the interest in its enforcement is outweighed in the circumstances by a public policy harmed by enforcement of the agreement." *Id.* at 392; *see also Davies v. Grossmont Union High School Dist.*, 930 F2d 1390, 1398 (9th Cir 1991) (applying the same principle to a settlement agreement that restricted appellant's federal constitutional right to run for public office). The federal principle requires a court to balance the enforceability of contracts against an identifiable public policy interest, typically embodied in a statute or constitution, given the circumstances surrounding the parties' decision to enter into the agreement.

The trial court incorrectly applied *Rumery*. Contrary to the trial court's reasoning, *Rumery* does not set out a two-part test, nor does it stand for the proposition that a settlement is not in the "public interest" unless a party receives a benefit that exceeds the speculative benefit of litigation. And, even if the trial court were correct in its reading of *Rumery*, we see no apparent basis on which to apply the federal common law discussed in *Rumery* to this case—an insurance case governed by Oregon law that does not involve the release of any federal right.

We note that, under Oregon law, "courts determine whether a contract is illegal by determining whether it violates public policy as expressed in relevant constitutional and statutory provisions and in case law, and by considering whether it is unconscionable." *Bagley v. Mt. Bachelor, Inc.*, 356 Or 543, 552-53, 340 P3d 27 (2014) (internal citation omitted); *see also id.* ("The fact that the effect of a contract provision may be harsh as applied to one of the contracting parties does not mean that the agreement is, for that

reason alone, contrary to public policy, particularly where 'the contract in question was freely entered into between parties in equal bargaining positions and did not involve a contract of adhesion[.]'" (Quoting *W.J. Seufert Land Co. v. Greenfield*, 262 Or 83, 92, 496 P2d 197 (1972).)). Safeco does not assert that the EDC Settlement violated public policy or was unconscionable, and the circumstances of this case do not appear to implicate those concerns. Accordingly, we conclude that the trial court erred in refusing to enter judgment on the jury's monetary award to plaintiff.

B.  *Safeco's Cross-Assignments of Error*

Because we conclude that the trial court erred when it declined to award plaintiff the amount of the jury verdict based on the court's determination that to do so would violate the public interest, we next consider Safeco's two cross-assignments of error. Safeco asserts in those assignments that the trial court erroneously denied its motions for directed verdict on plaintiff's fire-loss claim. In reviewing the denial of Safeco's motions for directed verdict, we view the evidence, including all reasonable inferences, in the light most favorable to plaintiff. *Najjar*, 203 Or App at 489-90. "If, after viewing the facts in that light, [Safeco] is entitled to judgment as a matter of law, then a directed verdict is appropriate." *Id.* at 490.

In its cross-assignments, Safeco argues that the EDC Settlement was not binding because there was no evidence that the adjustment of plaintiff's fire-loss claim was complete at the time the agreement was formed.[14] In so

---

[14] We note that Safeco's cross-assignments of error could be understood to be seeking to reverse or modify the judgment for plaintiff with "no damages taken" to an outright judgment for Safeco. In that circumstance, we would be compelled to reject Safeco's cross-assignments as procedurally improper. *See* ORAP 5.57(2) ("A cross-assignment is appropriate * * * [i]f, by challenging the trial court ruling, the respondent does not seek to reverse or modify the judgment[.]"); *see also Brock v. State Farm Mutual Auto. Ins.*, 195 Or App 519, 525-26, 98 P3d 759 (2004) (cross-assignment was not properly before the court because "[b]y arguing that the contract should have been rescinded, 'defendant here *does* seek to * * * modify the judgment on appeal,' as it seeks relief different from the relief granted by the trial court," which was summary judgment on the theory that plaintiff was not entitled to recover under the contract of insurance (emphasis in original)). However, based on the unusual nature of the judgment—which was entered in plaintiff's favor but included the trial court's conclusion that the contract was unenforceable as void and awarded no damages—we take Safeco's cross-assignments as seeking to only affirm the judgment as entered. That is,

arguing, Safeco asserts that, as a matter of law, an adjustment must be "complete" for an insurance company to be bound to a new agreement separate from the policy. For that argument, Safeco relies on *Western Loggers' Mach. Co. v. National Union Fire Ins. Co.*, 136 Or 549, 299 P 311, *reh'g den*, (1931), and *Ladd v. General Insurance Co.*, 236 Or 260, 387 P2d 572 (1963), *reh'g den*, (1964). Safeco further argues that there was no evidence that the adjustment was "complete" because the agreement to waive the policy requirement of replacing the destroyed house contemplated that dwelling payments would be paid only after the replacement value of the house was established—that is, the agreement itself recognized that the adjustment of the loss was still ongoing.[15]

As elaborated below, plaintiff responds that the authorities relied on by Safeco do not support Safeco's position that parties to an insurance policy can create a settlement contract only after the adjusted amount is fully completed and agreed upon. Because both parties' arguments rest on *Western Loggers'* and *Ladd*, we discuss those cases at some length. Ultimately, we reject Safeco's argument and its view of the case law.

In *Western Loggers'*, the plaintiff had insured a tractor that later was damaged in an accident. The insurer's adjustor investigated the accident and obtained repair estimates. Based on those estimates, the adjustor told the plaintiff to have the tractor repaired and that the insurer would pay the repair amount upon receipt of the invoices. The insurer refused to pay after receiving the invoices, which were within the range of the repair estimates. *Western Loggers'*, 136 Or at 551.

---

we take Safeco as asserting that, because the settlement agreement was unenforceable (although for a reason different than that relied on by the trial court), plaintiff "shall take no damages" under the judgment for plaintiff on that claim.

[15] Safeco also argues that the jury was instructed in conformance with its view of the law, which plaintiff has not assigned as error on appeal, and that, thus, there is no evidence on which the jury's verdict for plaintiff could be based. We see no significance to this separate argument in light of Safeco's cross-assignments on appeal to the trial court's denial of Safeco's directed verdict motions made before submission of the case to the jury. However, we note that, contrary to Safeco's argument, the jury was not instructed that a complete adjustment was the *only* way that a new contract could be formed between Safeco and plaintiff, having also been instructed on the general rules of contract formation. Safeco has not assigned error to the giving of those instructions.

Relying on the Corpus Juris (CJ), the Supreme Court set out the following legal principle, on which Safeco principally relies for its argument:

> "Where an adjustment has been fully completed and agreed upon by both parties, a new contract arises to pay the amount agreed upon as a result of the adjustment. And the action for the recovery for the adjusted loss is a suit, not upon the policy, but upon such new contract[.]"

*Id.* at 552 (citing 26 CJ § 532). The Supreme Court stated that "all the testimony indicates that the matter was fully adjusted and settled[.]" *Id.* at 551. Thus, what constitutes "fully adjusted" was not an issue in the case. Rather, the disputed issue was whether the adjustor had the authority "to make the adjustment and settlement." *Id.* at 552.

Plaintiff, for his part, points out that the Supreme Court concluded that a new, enforceable contract did arise in that case, even though the exact amount of the repair was not known at the time of the adjustment and settlement. He thus argues that Safeco's proposition that the exact amount must be known to constitute a complete adjustment, *i.e.*, settlement, *see id.* at 554 (noting that "adjust" means "to settle or arrange; to free from differences or discrepancies; to bring to a satisfactory state, so that parties are agreed"), does not follow.

*Western Loggers'* is not particularly helpful to Safeco. As noted, that case did not discuss what "fully adjusted" means, as it was not at issue. Moreover, that case, as quoted above, described one circumstance when an adjustment becomes binding upon an insurer as a new contract, such that it is bound to pay the adjusted, agreed-upon amount. It does not follow from *Western Loggers'* that, because a new contract is formed upon completion of the adjustment process, that that is the only means by which a new contract can be formed between an insurer and its insured.[16] And,

---

[16] We note that the court in *Western Loggers'* discussed that an adjustment is a settlement. Safeco, however, uses *Western Loggers'* to argue that all settlements between an insurer and its insured arise only from completed adjustments. That reasoning results in a logical fallacy. Just because all completed adjustments are settlements does not lead to the conclusion that all settlements must result from completed adjustments.

as plaintiff points out, under *Western Loggers'*, that type of new contract can arise even when the exact amount of the insurer's payment is not yet known and instead is based on an estimate. In our view, *Western Loggers'* does not control our analysis.

We turn to *Ladd*, Safeco's additional authority. In that case, the plaintiffs' building was damaged by an explosion. The plaintiffs and the defendant insurer came to an agreed-upon settlement amount for most of the damage, which the insurer paid. *Ladd*, 236 Or at 262. However, they kept open a claim of damage to concrete walls because the walls could not be inspected and appraised until certain cleanup was complete. "In the event the walls did not pass inspection, the insurer agreed to pay the additional loss as appraised, provided, however, that the liability in no event was to exceed $3,900. In the event that the walls satisfied the engineer, it was agreed that the insurer would have no further liability under its policy." *Id.* The parties later could not agree on what duty the insurer owed under the agreement.

The plaintiffs brought an action upon the fire insurance policy, which was dismissed because it was not brought within the limitations period specified in the policy. *Id.* at 263. The plaintiffs then brought a second action on the alleged settlement agreement. *Id.* at 264. After the plaintiffs obtained favorable answers to interrogatories from the jury, the trial court set them aside and entered judgment for the insurer, concluding that *res judicata* barred the plaintiffs' second action. *Id.* at 262. The only issue on appeal was whether the trial court properly applied the doctrine of *res judicata* or the related rule of election of remedies. *Id.*

In answering the *res judicata* question, the Supreme Court concluded that it must determine whether the settlement agreement was a "new contract," such that the second action was based on a cause of action different from the one the plaintiffs first brought based on the insurance policy. After discussing general principles of the contract doctrine of accord, the court held that, "if there was in fact a new contract, the second action, being upon the new contract, would be founded on a new cause of action and would not be barred

as an attempt to relitigate the old one." *Id.* at 267 (citing *Western Loggers'*, 136 Or at 552). The Supreme Court then held that the two cases "were founded upon different causes of action," that the doctrine of *res judicata* did not bar the second action, and that the dispute over the meaning of the parties' new agreement had to be tried on remand. *Id.* at 267-68.[17]

Safeco argues that, in *Ladd*, the court concluded that "the parties' settlement agreement, reached *after* the adjustment process had been completed, could constitute a new contract." (Emphasis in original.) Plaintiff, in contrast, argues that the *Ladd* court concluded that the settlement was binding apart from the insurance policy, even though the amount of loss to the concrete walls was left open.

Having carefully read *Ladd*, we agree with plaintiff's view of that case. As noted, the *Ladd* court relied on general contract law in its analysis. In doing so, the court stated that, "[i]f in fact the parties agreed to make a new contract, in the nature of an accord, and expressed such agreement in the words found on the proof-of-loss form, then a breach of that agreement by either of the parties could give rise to new legal rights." *Id.* at 266. The court held that the parties to an insurance policy can form a new contract distinct from the policy, even when the parties "kept open an undetermined element of damage," *id.* at 262, and the adjustment was not complete.

Thus, we reject the legal premise of Safeco's argument, which is that, under Oregon law, a completion of the adjustment process is the *only* way a new contract, distinct from an insurance policy, can be formed between an insurer and its insured.[18] Accordingly, we affirm the trial court's

---

[17] We recognize that the opinion in *Ladd* is somewhat ambiguous and could be read as not deciding whether the parties had in fact formed a binding settlement agreement. Here, both Safeco and plaintiff read *Ladd* as having concluded that the parties did form a binding settlement agreement, which we also conclude is a fair reading of that opinion. However, reading *Ladd* in that manner is not crucial to our decision, and we would adhere to our legal conclusion even if we did not agree with the parties' reading of *Ladd* on that point.

[18] We also note that Safeco's citation to the Corpus Juris Secundum (CJS) does not support its position. The section of the CJS to which Safeco cites provides, "Generally, an adjustment fixing the amount of loss is binding in the absence of fraud or mistake, but authorities differ as to whether it constitutes an

denial of Safeco's motions for directed verdict in which it urged that legal theory.

## IV.   EVIDENTIARY ERROR

Plaintiff, in his tenth and eleventh assignments of error, argues that the trial court erred in both admitting and excluding certain evidence at trial that pertains to his theft-loss claim that the jury rejected. Because plaintiff's assignments of error require factual context additional to that set forth above, we begin there.

### A.   *Facts*

As part of proving both his fire-loss and theft-loss claims, plaintiff presented evidence of his purchase of items that he claimed were destroyed in the fire and stolen from the outbuilding on his property after the fire. That evidence included many documents that plaintiff claimed he was able to salvage from the fire debris that he had kept stored, but not reviewed, until after Safeco brought its counterclaim against him. AOA West had asserted that some of those documents were fraudulent or forgeries. As relevant to plaintiff's theft-loss claim, at trial, AOA West presented evidence through an expert that several documents pertaining to items that plaintiff claimed were stolen were fraudulent.

Before trial, plaintiff had brought a motion *in limine* to exclude evidence of findings in a case plaintiff had brought in the United Kingdom against a former business partner

admission of liability or an implied promise to pay such loss." 46A CJS *Insurance* § 1877. Safeco relies on a portion of the discussion to that section, which provides:

> "According to other authorities, however, where a loss has been agreed on and a definite amount found due, a promise to pay will be implied, although there is no express promise on the part of the company. Accordingly, when an adjustment has been fully completed and agreed to by both parties, a new contract arises to pay the amount agreed on as the result of the adjustment."

(Footnotes omitted.) That section of the CJS, however, like *Western Loggers'*, discusses only when an *adjustment* becomes binding on an insurance company such that the company is bound to pay the adjusted amount. That section does not apply to *settlements* of claims, which is what plaintiff alleged occurred and what the jury found did occur in this case. In the case of settlements, the CJS instructs that the usual rules of contract formation apply. *See, e.g.*, 46A CJS *Insurance* § 1879 ("The parties to an insurance contract may compromise and settle a doubtful or disputed claim for loss, and such settlements have all the elements of a contract and must be understandingly made by authorized persons.").

and his partner's company, ISTIL. In that case, the trial-level court issued an opinion in May 2008 that contained extensive findings, including that plaintiff had forged documents he introduced into the case (the ISTIL forgery findings). Both Safeco and AOA West argued for admission of the evidence. The trial court deferred a ruling until trial.

During trial, plaintiff testified about his poor typing skills and general inability to create a correct document and his reliance on others to do most of his typing for him. Plaintiff's direct testimony included, among others, the following separate exchanges concerning a number of different exhibits:

"Q.  And what is Exhb. 602?

"A.  Exhb. 602 is my letter to him dated 1996.

"Q.  And did you prepare this letter?

"A.  Yes.

"Q.  Did you type it or did you have somebody type it for you?

"A.  It looks like I must have typed it, because it's not a very good typing.

"Q.  [Plaintiff] did you prepare Exhb. 604 directly or indirectly?

"A.  Most likely, that is.

"Q.  And you say that because you don't identify any typing errors on it?

"A.  That, and it looks a little too clean for me to type something like that.

"Q.  [Plaintiff], will you explain to the jury how you prepared Exhb. 245-2 ***?

"A.  First of all, this is the spreadsheet that is prepared by me, but typed by Travis Shafer who works with me.

"Q.  And who created Exhb. 158?

"A.  Part of this was created by me and part[] of it was created by Tracy.

"Q.  And can you identify who created which parts?

"A. There's typos, and if they're not typed correctly and lined up, then it's me. If it's done correctly, then it's Tracy Brophy.

"Q. Then there's a note there that says 'retain the existing cover' rather than 'Exiting cover.'?

"A. Yes.

"Q. Do you know what that refers to?

"A. Obviously that was typed by me."

On cross-examination, plaintiff's testimony included the following exchange:

"Q. * * * This is a document you prepared?

"A. Yes.

"Q. And can you tell it's—

"A. I did not prepare. I dictated to Travis Shafer.

"A. All right. And I think we understand. You yourself are not a particularly adept typist, I take it?

"Q. No, I'm not. I'm more of a dictating person."

Later in trial, during its case, AOA West introduced expert testimony that certain of the fire-salvaged documents were fraudulent, including about 10 documents that were admitted in support of plaintiff's theft-loss claim. The expert based his opinion on an analysis of the availability of word processing fonts and typography used in the documents as compared to the date indicated on a document. In his rebuttal case, plaintiff introduced his own expert's testimony that there was "no forensic documents evidence to suggest that any of the[] documents [we]re fraudulent" and critiquing the methodology used by AOA West's expert. At the close of his direct testimony, plaintiff's expert testified as follows:

"Q. What's the likelihood that someone as alleged here could go out and create all of these different fonts and all these different printing processes and letterheads and the like in recent years?

"A. I would—anything is possible, but it is very difficult and very unlikely."

Based on that testimony, AOA West sought to introduce the ISTIL forgery findings in which the court had found plaintiff to have forged a "significant" number of documents and to be an "accomplished forger of documents." Plaintiff objected on the grounds that the ISTIL forgery findings were not independently relevant for a noncharacter purpose, as required by OEC 404(3), concerning the admissibility of "other acts" evidence, and any probative value was substantially outweighed by the danger of unfair prejudice, under OEC 403.

After briefing and argument on the issue, the trial court ruled that a heavily redacted version of the ISTIL opinion could be admitted through testimony by plaintiff. Primarily, the court reasoned that the forgery findings were admissible to impeach plaintiff because (1) the findings were independently relevant for the noncharacter purpose "of showing whether or not, contrary to evidence received, [plaintiff] does have the level of sophistication and skill that would enable him, if he wanted to, to create inauthentic documents," (2) "the proponent has offered sufficient proof that this uncharged conduct was committed" by plaintiff, and (3) on balance, the evidence was not unfairly prejudicial to plaintiff under OEC 403. As a second basis, the court also concluded that the findings were admissible under the factors in *State v. Johns*, 301 Or 535, 725 P2d 312 (1986), as relevant to the noncharacter purpose of absence of mistake, a theory of admissibility argued by AOA West. The court prepared the redacted version, with input from the parties, so that the admitted version included only those portions relevant to "show that [plaintiff] is capable and has the sophistication and skill to create inauthentic documents."

In connection with its ruling on the admissibility of the ISTIL forgery findings, the trial court also ruled that plaintiff could not present evidence that sought to factually undermine those findings because, the court concluded, it would be a collateral attack on judicial findings "after extensive due process was given to [plaintiff]" in the ISTIL case. The court stated that it would allow plaintiff "to have some limited chance to state his position and make his explanation," but that it would not allow it "to go too far and become[] a collateral attack." Plaintiff placed in the record extensive offers of proof as to what he sought to admit with regard to

the ISTIL forgery findings, which the court had excluded. Those offers included testimony from five witnesses who would support plaintiff's testimony that the forgeries in the ISTIL case were created by the defendant in that case and not plaintiff.

On appeal, plaintiff assigns error both to the trial court's admission of the ISTIL forgery findings and to its exclusion of plaintiff's evidence rebutting those findings.

B. *Admission of the ISTIL Forgery Findings*

Evidence of "other crimes, wrongs or acts," such as plaintiff's forgeries in the ISTIL case, "is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." OEC 404(3). In assessing the admissibility of such evidence, we apply a three-part test:

> "(1) The evidence must be independently relevant for a noncharacter purpose; (2) the proponent of the evidence must offer sufficient proof that the uncharged misconduct was committed and that [the person] committed it; and (3) the probative value of the uncharged misconduct evidence must not be substantially outweighed by the dangers or considerations set forth in OEC 403."

*State v. Johnson*, 313 Or 189, 195, 832 P2d 443 (1992) (footnotes omitted). In certain contexts, the first part of that test will incorporate additional factors. *See State v. Grey*, 175 Or App 235, 248, 28 P3d 1195 (2001), *rev den*, 333 Or 463 (2002) (additional factors required for evaluating uncharged misconduct evidence to prove identity based on *modus operandi* or to prove intent). On appeal, plaintiff does not contend that the second part of that test was not met; thus, we do not address it. As to the other parts of the test, we review whether the evidence is relevant for a noncharacter purpose as a matter of law, and whether the evidence should be excluded under OEC 403 for an abuse of discretion. *Woodbury v. CH2M Hill, Inc.*, 189 Or App 375, 383-84, 76 P3d 131 (2003), *rev den*, 336 Or 615 (2004).

Here, the trial court admitted the ISTIL forgery findings both as impeachment of plaintiff's testimony that created the perception that he lacked the skill to create forged documents and to show absence of mistake. Because we conclude that the trial court did not err when it admitted the ISTIL forgery findings as impeachment evidence, and plaintiff argues only that admission of the forgery findings on any ground was reversible error, we address only that ground for admission.[19]

Turning to the first part of the test, to be relevant, the evidence must tend "to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." OEC 401. "The threshold established by OEC 401 is 'very low'—if evidence even slightly increases or decreases the probability of the existence of a fact of consequence, then it is relevant." *Grey*, 175 Or App at 249 (quoting *State v. Titus*, 328 Or 475, 480-81, 982 P2d 1133 (1999)).

Plaintiff argues that the ISTIL forgery findings were not relevant independent from the improper propensity purpose of "once a forger, always a forger." Plaintiff asserts that the ISTIL forgery findings were not relevant for impeachment because the forgeries in the ISTIL case were not sufficiently similar to the forgeries alleged in this case to be used to show that plaintiff had the skill to create the forgeries in this case. Plaintiff argues that the kind of expertise needed to make the forgeries alleged in this case, including creating different letterheads, logos, and fonts, was different from the forgeries found in the ISTIL case.

In making that argument, plaintiff implicitly applies a stringent test for relevance, one higher than the "very low" threshold set by OEC 401. However, "no additional relevancy factors are applicable to relevancy determinations in the context[] of impeachment," *Grey*, 175 Or App at 250, and, thus, we consider only whether the ISTIL forgery findings were relevant for impeachment purposes under OEC 401. In addition, plaintiff's argument is based on

---

[19] In other words, plaintiff does not argue that, if the admission of the ISTIL forgery findings was proper for impeachment but not as substantive evidence, he nevertheless suffered prejudice.

a factual error to the extent that he suggests that the only kind of forgery found in the ISTIL case involved the copying and lifting of signatures.

Here, the trial court admitted the ISTIL forgery findings to impeach the factual assertion by plaintiff that he was incapable of creating documents that were not riddled with mistakes (which created the inference that he was incapable of forgery). Plaintiff testified, more than once, that he could not type well, nor create a "clean" document; that he mostly dictated to others; and that he could tell if he created a document based on whether it was badly typed. Plaintiff's forgery expert later testified that it would be "very difficult and very unlikely" that someone could go out and create the forgeries in this case, which involved different fonts, printing processes, and letterheads. The thrust of all that testimony was to create the perception with the jury that plaintiff lacked any skill to have forged the documents in this case.

The ISTIL forgery findings were relevant under OEC 401 because they tended to show that plaintiff did have the skill and sophistication to create forged documents—which, in the ISTIL case, included the creation of several letters and documents (both typewritten and on word processing equipment), faxes from different places, and forged signatures. That relevancy goes to the impeachment of plaintiff's factual assertions, not whether he had a propensity to forge documents. *See State v. Manrique*, 271 Or 201, 213, 531 P2d 239 (1975) (uncharged misconduct evidence admissible to impeach credibility of defendant's testimony); *State v. Smith*, 86 Or App 239, 244, 739 P2d 577 (1987) (evidence of "other crimes" of the defendant that contradicts a statement of fact made by a witness may be used to impeach that witness's credibility). *See also State v. Momeni*, 234 Or App 193, 227 P3d 1230, *rev den*, 348 Or 523 (2010) (high degree of similarity of circumstances between uncharged conduct and current charges not required when evidence is used for purpose other than to prove identity). Thus, the trial court did not err when it concluded that the ISTIL forgery findings were relevant for the noncharacter purpose of impeaching plaintiff's testimony.

For the third part of the test, we review whether the trial court abused its discretion in determining that the probative value of the ISTIL forgery findings was not significantly outweighed by unfair prejudice to plaintiff. "Unfair prejudice," in the context of OEC 403, means "'an undue tendency to suggest [a] decision[] on an improper basis, commonly, although not always, an emotional one.'" *State v. Pinnell*, 311 Or 98, 106 n 12, 806 P2d 110 (1991) (quoting Legislative Commentary to OEC 403, *reported in* Kirkpatrick, Oregon Evidence 125 (2d ed 1989) (brackets in *Pinnell*)). "Abuse of discretion occurs when the trial court's discretion 'is exercised to an end not justified and clearly against the evidence and reason.'" *State v. Sullivan*, 152 Or App 75, 78, 952 P2d 100 (1998) (quoting *State v. Parker*, 119 Or App 105, 109, 849 P2d 1157, *rev den*, 317 Or 584 (1993)).

Plaintiff argues that the trial court abused its discretion in admitting the ISTIL forgery findings because, contrary to the trial court's view, Safeco had no strong need for the forgery findings when it already had a full opportunity to test and challenge the authenticity of plaintiff's fire-salvaged documents through cross-examination and the testimony of its own forensics expert. In addition, plaintiff argues that the findings were extremely prejudicial to him because, as judicial findings, "the jury likely viewed the ISTIL forgery findings as particularly trustworthy and entitled to weight."

Here, the trial court carefully balanced the probative value of the findings, defendants' need to admit the findings because of the misperception plaintiff created about himself in his testimony, and the prejudice to plaintiff. In balancing those considerations, the trial court clearly understood the potential prejudice to plaintiff and had, up until that point, prevented defendants from admitting the findings because of that danger. With that potential for prejudice in mind, the trial court heavily redacted the ISTIL opinion to omit reference to anything other than plaintiff's creation of forged documents in the ISTIL case. That redaction resulted in 12 short paragraphs of findings being admitted at trial out of the 292 paragraphs of findings in the full ISTIL opinion. We conclude that the trial court permissibly determined that the probative value of those limited findings, which directly

related to plaintiff's ability to create forged documents, was not significantly outweighed by the danger of unfair prejudice to plaintiff. Accordingly, the trial court did not err in admitting the ISTIL forgery findings.

C.  *Exclusion of Plaintiff's Rebuttal of the ISTIL Forgery Findings*

In plaintiff's eleventh assignment of error, he argues that the trial court erred in excluding his evidence attacking the factual underpinnings of the ISTIL court's findings about plaintiff forging documents. As set out above, the trial court excluded that evidence because it determined that it would be a collateral attack on judicial findings made after plaintiff was afforded due process on the issue.

Plaintiff argues that "it is legal error for a trial court to exclude all rebuttal evidence offered to counter new matters on central issues." Citing *Pinnell*, plaintiff asserts that it is "beyond dispute" that a party has a right to present rebuttal to evidence of uncharged misconduct. In addition, citing OEC 803(22) Commentary (1981), plaintiff asserts that, under Oregon law, parties are permitted to rebut findings underlying criminal judgments and thus the same rule should be extended to civil judgments, which have a lower standard of certainty.

In *Pinnell*, the Supreme Court discussed the purpose of the evidence rules relating to the general inadmissibility of "other crimes" evidence for propensity purposes in a criminal trial. In that discussion, the court cited to various sources about the reasons for the rule and stated that, among other reasons, "it is viewed as unfair to require an accused to be prepared to not only defend against the immediate charge, but also to defend or explain away unrelated acts from the past" and that "courts are concerned with confusion of issues and undue consumption of time through what may be, in effect, a trial within a trial to ascertain the relationship between the purported other crime and the defendant." *Pinnell*, 311 Or at 106. Plaintiff takes that discussion as demonstrating that it is "beyond dispute" that he must be permitted to present evidence that rebuts evidence of uncharged misconduct. We disagree.

Plaintiff's concern here is addressed by the second part of the test of admissibility discussed above: "the proponent of the evidence must offer sufficient proof that the uncharged misconduct was committed and that [the person] committed it," *Johnson*, 313 Or at 195. The discussion in *Pinnell* does not stand for a general proposition that a party, in a civil case, must be permitted to put on a full "trial within a trial" for the jury after a trial court has already determined that the proponent of the evidence has established that the uncharged misconduct was committed by the party against whom it is offered. *See* OEC 104(1) ("Preliminary questions concerning * * * the admissibility of evidence shall be determined by the court[.]"); *Rugemer v. Rhea*, 153 Or App 400, 410, 957 P2d 184 (1998) ("Given * * * the dangers of exposing the jury to highly prejudicial other act evidence, we hold that the proponent of other act evidence must prove by a preponderance of the evidence under OEC 104(1) that the other act occurred and that the person against whom it is offered committed it.").

Here, plaintiff had the opportunity to dispute, and the trial court concluded, that the second part of the admissibility test was established because the ISTIL court made extensive findings after plaintiff was accorded full due process in that case. Plaintiff has not argued that the trial court's ruling in that respect was in error. Accordingly, we reject plaintiff's argument that, based on *Pinnell*, the trial court was required to allow plaintiff to present *to the jury* the testimony of his additional witnesses who would claim that plaintiff was innocent of the forgeries and that it was the defendant in the ISTIL case who had created the forgeries and duped plaintiff into offering them in that case.

As to plaintiff's second argument in support of his position, OEC 803(22) is an exception to the hearsay rule for the admission of judgments of conviction. The commentary to that rule notes that the part of the rule allowing a prior judgment of conviction to be used as evidence of a fact in issue was new in Oregon at the time, which raised the concern of a jury giving it substantial weight without explanation from the defendant. *See* OEC 803(22) Commentary (1981) ("While this may leave a jury with evidence of conviction without the means of evaluating it, it is safe to assume that

the jury will give substantial weight to a judgment unless the defendant satisfactorily explains it—a possibility that is not foreclosed."). To the extent that commentary note has any bearing in this case, here the trial court did allow plaintiff to explain the ISTIL forgery findings, including allowing plaintiff, in his testimony, to implicate the defendant in the ISTIL case as the real forger. What the trial court did not allow plaintiff to do was to put on several other witnesses protesting plaintiff's innocence and pointing fingers at the defendant in the ISTIL case, who was not present in this case to defend himself. That is, the trial court did not allow plaintiff to put on a full-scale, one-sided collateral attack of the ISTIL forgery findings.[20] Plaintiff has not explained why the trial court was legally required under OEC 803(22) to allow him to collaterally attack those findings in front of the jury, and we are not aware of any such precedent.

The trial court did not legally err when it limited plaintiff's rebuttal of the ISTIL forgery findings. Accordingly, we affirm the judgment for Safeco on plaintiff's theft-loss claim.

### V. OVERLAND'S MOTION FOR SUMMARY JUDGMENT

Finally, we address plaintiff's twelfth assignment of error, challenging the trial court's grant of summary judgment to Overland, which we affirm. On review from that grant of summary judgment, we view the summary judgment record in the light most favorable to plaintiff, the nonmoving party, and draw all reasonable inferences in his favor. *Jones*, 325 Or at 408. In this case, however, plaintiff does not contend that there is a factual dispute; rather, plaintiff contends that the trial court committed legal error.

The trial court granted summary judgment to Overland based on the economic loss doctrine. Under that doctrine, "a negligence claim for the recovery of economic

---

[20] A collateral attack "is an attempt to impeach the decree [a judgment] in a proceeding not instituted for the express purpose of annulling, correcting, or modifying the decree or enjoining its execution." *Morrill v. Morrill*, 20 Or 96, 101, 25 P 362 (1890).

losses caused by another must be predicated on some duty of the negligent actor to the injured party beyond the common law duty to exercise reasonable care to prevent foreseeable harm." *Onita Pacific Corp. v. Trustees of Bronson*, 315 Or 149, 159, 843 P2d 890 (1992) (footnote omitted). Plaintiff does not dispute that his negligent misrepresentation claim against Overland sought only economic loss. Thus, for his claim to survive, plaintiff had to show that Overland had a duty to plaintiff "beyond the common law duty to exercise reasonable care to prevent foreseeable harm." *Id.* "[T]hat kind of heightened duty arises when one party is acting, at least in part, to further the economic interests of the other party." *Conway*, 324 Or at 236-37. "In other words, for the duty to avoid making negligent misrepresentations to arise, the parties must be in a 'special relationship,' in which the party sought to be held liable had some obligation to pursue the interests of the other party." *Id.* at 237. The trial court concluded that there was no special relationship between plaintiff and Overland, reasoning that plaintiff's "relationship with Safeco is an inadequate link for creation of a special duty owed by Overland" and that plaintiff "also never directly or indirectly authorized Overland to exercise independent judgment on his behalf."

On appeal, plaintiff does not focus on the trial court's ruling that, under Oregon law, to pursue his negligent misrepresentation claim, plaintiff had to establish a special relationship with Overland. Instead, relying in part on the *Restatement (Second) of Torts* section 552 (1977) and on *Onita*, plaintiff argues that, "as a nongratuitous supplier of information for the benefit of [plaintiff], Overland owed a duty of care to [plaintiff] to avoid negligent misrepresentations about the replacement-costs value of his property." Plaintiff argues that Overland owed him that duty because he "was within 'a limited group of persons for whose benefit and guidance' Overland supplied the appraisal or knew that Safeco intended to supply the appraisal." (Quoting *Restatement (Second) of Torts* § 552 (1977)).

Overland responds that *Restatement* section 552 has not been adopted in Oregon, and, even if it has, it does not apply in this case. Overland also argues that it did not have a special relationship with plaintiff, as defined in Oregon case

law, and that plaintiff was never anything more than an incidental beneficiary of the relationship between Overland and Safeco.[21]

As an initial matter, to the extent that plaintiff argues that we should apply *Restatement* section 552 as setting out, as "black letter law," the elements that plaintiff must prove to make out his negligent misrepresentation claim, we reject that argument. In *Onita*, 315 Or at 159, and again in *Conway*, 324 Or at 245 (Fadeley, J., dissenting), the Supreme Court specifically declined to adopt section 552 as the black letter law in Oregon, and instead adhered to a case-by-case analysis of whether the parties had a special relationship based on the considerations discussed in those two cases. *See also Loosli v. City of Salem*, 345 Or 303, 311, 193 P3d 623 (2008) (declining to revisit issue of whether to adopt *Restatement* section 552). We are bound by those precedents.

As relied on by plaintiff, in *Onita*, the Supreme Court briefly discussed nongratuitous suppliers of information in the context of *Restatement* section 552, and held that the concept does not apply to an adversarial or arms-length negotiation relationship. In so holding, the court explained that Oregon law concerning special relationships was consistent with that part of section 552:

> "We read Restatement section 552 as consistent with the rule that this court has adopted for negligence actions for the recovery of economic losses, *viz.*, nongratuitous suppliers of information owe a duty to their clients or employers or to intended third-party beneficiaries of their contractual, professional, or employment relationship to exercise reasonable care to avoid misrepresenting facts."

315 Or at 165. It did not adopt *Restatement* section 552.

---

[21] We summarily reject Overland's assertion that plaintiff failed to preserve his arguments based on Overland being a "nongratuitous supplier of information." Although plaintiff may not have used that exact term in the trial court, the substance of plaintiff's argument to the trial court is the same as the one raised on appeal. *State v. Hitz*, 307 Or 183, 188, 766 P2d 373 (1988) ("We have previously drawn attention to the distinctions between raising an *issue* at trial, identifying a *source* for a claimed position, and making a particular *argument*. * * * The first ordinarily is essential, the second less so, the third least." (Emphasis in original.)).

Thus, we must examine the facts of this case, as developed in the summary judgment record, to determine if plaintiff raised a genuine issue of fact as to the nature of Overland's and plaintiff's relationship and whether it was a "special relationship" as a matter of law. *See Lewis-Williamson v. Grange Mutual Ins. Co.*, 179 Or App 491, 495, 39 P3d 947 (2002) ("Whether the relationship is one that gives rise to an enhanced duty is a question of law."). In doing so, we focus on the Services Agreement between Overland and Safeco and the pages of Overland's website that are in the record, because plaintiff relies on those documents in arguing that he is an intended third-party beneficiary of Overland's professional opinions.[22]

In the "Scope of Services" exhibit to the Services Agreement, paragraph 1 sets out the "Objective," which provides:

"1.1 Safeco has identified an ongoing business initiative that will be furthered by a supplier-provided solution for High-Value Residential Real Estate Inspection Services of properties policyholder [sic] by Safeco. Safeco Personal Insurance (SPI) will leverage information and data contained in the Inspection reports tendered by the successful bidder to further the following goals:

"1.1.1. Effectively balance the Inspection costs and loss prevention;

"1.1.2. Select appropriate risks;

"1.1.3. Improve relationships between Safeco, Independent Safeco agents and our policyholders;

"1.1.4. Protect each policyholder with adequate coverages, and;

"1.1.5. Ensure profitability to maximize shareholder benefits, which are in the alignment with corporate

---

[22] Plaintiff also summarily argues that, because Overland's replacement-cost estimate set the maximum amount of coverage available to him under ORS 742.200, Overland must be charged with knowledge of that legal consequence and that, thus, Overland's report "was intended to protect his interests by ensuring the adequacy of his coverage." We reject that argument, which plaintiff did not make below, as insufficiently developed for appeal based on the summary judgment record.

goals to become a low-cost carrier and thereby grow profitability.

"1.2    The purpose of each inspection is to:

"1.2.1.    Verify the accuracy and specifications of the property and the dwelling;

"1.2.2.    Ascertain potential hazards, and;

"1.2.3.    Ensure that the insurance coverage is adequate in relationship to the replacement cost."

Plaintiff relies on paragraphs 1.1.4. and 1.2.3., which both reference that Safeco will use the inspection services and individual inspection reports to ensure that policyholders have adequate coverage.

Plaintiff also points to two pages on Overland's website, which markets its services for insurance companies. On a page about "High Value Surveys," Overland represents that its services, among other things, "can assist you in providing an extra level of service for your most important clients." The "Frequently Asked Questions" page contains the following response to the question, "What is the purpose of a survey?":

"The primary reason for our survey is to determine an accurate replacement cost for the home and to provide a comprehensive risk analysis. This will give you and your customers the peace of mind that comes from knowing the coverage amounts are adequate, in addition, our loss control experts make recommendations on how to prevent a future loss and document unique construction and architectural features of a home."

Based on those documents, plaintiff argues that, although he is not a contractual third-party beneficiary of the Services Agreement, he is an intended third-party beneficiary "of the specific professional opinions that Overland provided about the replacement value of his home," because the above statements demonstrate that Overland's opinions were, at least in part, for the economic benefit of plaintiff.

As pointed out by Overland, the Services Agreement and its report also include provisions that cut against plaintiff's argument. The Services Agreement explicitly provides that "[n]either Party intends this Agreement to benefit, or create any right or cause of action in or on behalf of, any

person or entity other than the Parties." Overland's report for plaintiff's property similarly provides, in part, that "[t]his report is the property of and for the exclusive use and benefit of the Contracting Insurance Company and shall not be used by any other person for any other purpose." We also note that, under the Services Agreement, Overland had no control over how its report on plaintiff's property would be used or shared by Safeco, including that Safeco had complete discretion to determine what portions, if any, it would provide to plaintiff.

True to that contractual agreement, Overland had no contact with plaintiff, other than the tour of his house, and it supplied its report directly to Safeco. Safeco then gave the report to AOA West, which then forwarded it to plaintiff, at which point, plaintiff disputed its accuracy.

As explained in *Onita*, a special relationship can exist between a nongratuitous supplier of information and the party that paid for its services or to intended third-party beneficiaries *of the relationship* between the supplier and the party that paid for its services. *Onita*, 315 Or App at 165. Plaintiff argues that he was an intended third-party beneficiary of the relationship between Overland and Safeco, which paid for Overland's services, because the purpose of Overland's report "served at least in part to further [plaintiff's] economic interests because an accurate assessment of his insurance needs protected [plaintiff] in the event of a loss."

The problem with plaintiff's argument is that, contrary to *Onita*, he focuses on the value of Overland's replacement-cost report to him and not on whether the relationship between Overland and Safeco was intended to benefit plaintiff's economic interests. It is undisputed that Overland supplied the report to Safeco, which was in an arms-length relationship with plaintiff. The provisions in the Services Agreement and report expressly denied the existence of any third-party beneficiary of the opinions contained in the report. Also, the relationship between Overland and Safeco, as defined in the Services Agreement, demonstrated that Overland could not have been acting in plaintiff's economic interests because Overland did not have control over how Safeco would use or disclose the information that it supplied,

nor did Overland have any information about what plaintiff's economic interests might be.

The facts of this case are distinguishable from those in *Meininger v. Henris Roofing & Supply*, 137 Or App 451, 905 P2d 861 (1995), *rev den*, 322 Or 489 (1996), a case on which plaintiff largely relies. In *Meininger*, the plaintiffs were concerned about the roof of a house that they wanted to purchase, and requested that the real estate agent for the sellers have the roof inspected. *Id.* at 453. The agent hired the defendant to inspect the roof and requested that the defendant meet with her and the plaintiffs at the house. The defendant inspected the roof and provided a report that said that the roof should last another 8 to 10 years. The plaintiffs purchased the house, and the roof leaked the next winter. We concluded that there was a special relationship between the plaintiffs and the defendant to support the plaintiffs' claim for negligent misrepresentation because "the purpose of [the roof] inspection was to provide an opinion about the condition of the roof to plaintiffs as potential purchasers. Thus, plaintiffs were intended beneficiaries of the contractual relationship." *Id.* at 454. The evidence in that case showed that the defendant knew that it was supplying the report to be communicated to and relied on by the plaintiffs. *Id.* at 454-55. *Cf. Hettle v. Construction Contractors Board*, 260 Or App 135, 150, 316 P3d 344 (2013), *rev den*, 355 Or 380 (2014) (concluding that inspector's knowledge that his letter to the seller would be forwarded to a potential purchaser was not sufficient to create a special relationship under the facts of that case).

In contrast, the summary judgment record here contains no evidence that a purpose of Overland's report was for it to be transmitted to and relied on by plaintiff. As set out above, the contractual relationship between Overland and Safeco contemplated that Overland's report would be used and relied on by Safeco for several purposes, but that it was up to Safeco whether, and in what form, any policyholder would ever receive any information contained in an Overland report. And, in this case, there is no evidence that Overland knew that Safeco had decided to transmit its report to AOA West, which in turn transmitted it to plaintiff. Based on this summary judgment record, there is

no special relationship between plaintiff and Overland, as set out in *Onita* and *Meininger*, because there is no evidence that Overland was acting on behalf of plaintiff's economic interests or that plaintiff was an intended third-party beneficiary of Overland's and Safeco's relationship. Accordingly, the trial court did not err in granting summary judgment to Overland.

## VI. CONCLUSION

In summary, we conclude that the trial court erred in denying plaintiff's motion for directed verdict on Safeco's breach-of-contract counterclaim because there is no evidence in the record that Safeco reasonably relied to its detriment on the misrepresentations that the jury found plaintiff had made to Safeco about three house components. We also conclude that the trial court erred in refusing to enter judgment on the jury's damage award to plaintiff based on the EDC Settlement because the trial court erroneously concluded that the contract was void as against public policy and because the trial court did not err when it denied Safeco's motions for directed verdict on that claim. Accordingly, on the claims related to plaintiff's fire loss, we reverse the judgment for Safeco on its counterclaim and vacate and remand the judgment for plaintiff with instructions to enter a judgment for plaintiff in the amount of the jury's award to plaintiff.

We affirm the judgment for Safeco on plaintiff's theft-loss claim because the trial court did not err in admitting the ISTIL forgery findings and did not err in excluding plaintiff's evidence offered to rebut those findings. Finally, we also affirm the trial court's grant of summary judgment to Overland because, based on the summary judgment record, there was no special relationship between plaintiff and Overland to support plaintiff's claim for negligent misrepresentation.

Judgment on Safeco's counterclaim for breach of contract against plaintiff reversed; judgment on plaintiff's claim for breach of contract for his fire loss against Safeco vacated and remanded with instructions to enter judgment for plaintiff in the amount of the jury's award to plaintiff, and otherwise affirmed; cross-appeal dismissed as moot.